[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 16, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-11150

_____

D. C. Docket No. 98-01929-CV-T-17MSS

MARTIN E. GROSSMAN,

Petitioner-Appellant,

versus

JAMES MCDONOUGH,
Secretary, Florida Department of Corrections,
CHARLIE CRIST,
Attorney General of the State of Florida,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 16, 2006)

Before TJOFLAT, BLACK and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this death case Martin E. Grossman appeals from the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He claims that his Sixth Amendment right to confrontation was violated when the state trial court refused to sever his case from his co-defendant, whose confession -- which also implicated Grossman -- was introduced at trial, albeit against only the co-defendant. Grossman also maintains that the state impermissibly withheld Brady material concerning three prosecution witnesses, and that he received ineffective assistance of counsel at the penalty phase of his capital trial. The Supreme Court of Florida affirmed his conviction and sentence on direct appeal and affirmed the denial of his post-conviction requests for collateral relief. After thorough review, we affirm.

**I.**

Grossman was convicted of first-degree murder by a state-court jury in Pinellas County, Florida, after he shot and killed Margaret Park, a wildlife officer employed by the Florida Game & Fish Commission, while she was engaged in the lawful performance of her duties. The same jury unanimously recommended that Grossman be sentenced to die, and the state trial judge entered an order consonant with that recommendation. The Supreme Court of Florida affirmed Grossman's

2

conviction and sentence on direct appeal. Grossman v. State, 525 So. 2d 833 (Fla. 1988) (Grossman I). Grossman then filed a state petition for post-conviction relief, which was denied by the trial judge[1] in an order subsequently affirmed by the Supreme Court of Florida. Grossman v. Dugger, 708 So. 2d 249 (Fla. 1997) (Grossman II). Thereafter, Grossman filed a habeas petition in the United States District Court for the Middle District of Florida, alleging eighteen constitutional errors. In a well-reasoned and comprehensive order, the district judge denied habeas relief on all grounds, Grossman v. Crosby, 359 F. Supp. 2d 1233 (M.D. Fla. 2005) (Grossman III), and we granted a certificate of appealability on three issues: first, whether the state trial court violated Grossman's Sixth Amendment right of confrontation when it refused to sever Grossman's trial from his co-defendant, Thayne Taylor; second, whether the prosecutors violated Brady v. Maryland, 373 U.S. 83 (1963), and its progeny by failing to disclose exculpatory material relating to witnesses Charles Brewer, Brian Hancock, and Brian Allan; and, finally, whether Grossman received ineffective assistance of counsel at the penalty phase of his trial.[2]

---

[1]The judge who resolved Grossman's post-conviction claim for relief was the same judge who presided over the original trial.

[2]The district court considered eighteen claims: 1) whether the failure to sever violated Grossman's Sixth Amendment rights; 2) whether the state public defender's office had an impermissible conflict of interest; 3) whether the state sentencing court violated Grossman's rights under the Eighth and Fourteenth Amendments by failing to timely state the reasons for

The facts of this case, which we glean from the trial testimony, the state collateral hearing, and the opinions of the Florida courts, are these. Grossman and a companion, Thayne (Tommy) Taylor, drove to a wooded area of Pinellas County on December 13, 1984, to shoot a handgun that Grossman, Taylor, and Brian Hancock, Grossman's friend and roommate, had recently stolen. At the time, Grossman was living in nearby Pasco County and was on probation following a recent prison term. Florida wildlife officer Margaret (Peggy) Park was on patrol in the area and became suspicious when she saw Grossman and Taylor. She parked her patrol truck near Grossman's van and took possession of Grossman's weapon, which she found under the driver's seat of the van, and his driver's license.

Grossman pleaded with the officer not to arrest him because possessing a weapon and being outside of Pasco County would have violated the terms of his probation. Officer Park refused his pleas, opened the driver's door to her vehicle,

---

imposing a death sentence; 4 & 5) whether the state trial judge violated the Constitution by refusing to give certain requested jury instructions; 6) whether Grossman received ineffective assistance of counsel on direct appeal; 7) whether the state withheld Brady material; 8) whether state prosecutors improperly questioned Grossman outside the presence of counsel; 9 & 17) whether Grossman received ineffective assistance of counsel at the penalty phase; 10) whether the jury was properly instructed on aggravating factors at the penalty phase; 11) whether Fla. Stat. § 921.141 is unconstitutional; 12) whether the state trial court violated Grossman's constitutional rights by denying a continuance; 13) whether the state trial court violated Grossman's constitutional rights by admitting gory and gruesome photographs; 14) whether the state trial court erred in admitting victim impact and character evidence; 15) whether Florida's capital sentencing scheme is unconstitutional; 16) whether Grossman received ineffective assistance of counsel at the guilt phase; and 18) whether the Florida capital sentencing scheme comports with Ring v. Arizona, 536 U.S. 584 (2002).

and reached in to pick up her radio microphone so she could call the sheriff's office. Grossman then grabbed the officer's large metallic flashlight and struck her repeatedly on the head and shoulders, forcing her upper body into the truck. Officer Park managed to exclaim "I'm hit" over the radio, and deputies from the Pinellas County Sheriff's Office began responding to her location.

Grossman continued his attack on Officer Park and called for help from Taylor, who then joined in the assault. Officer Park drew her firearm, a .357 magnum, and fired one shot that narrowly missed hitting Taylor in the head. Simultaneously, she temporarily disabled Taylor by kicking him in the groin. Grossman, who was significantly larger than Officer Park, gained control of her weapon and fired one shot into the back of her head, killing her.

Grossman and Taylor then took back the seized handgun and driver's license and fled with Officer Park's weapon. They returned to Grossman's home where they told the story of the shooting, both individually and collectively, to Brian Hancock. Hancock and Taylor buried the two guns near the crime scene. Grossman, whose clothing was covered in blood, unsuccessfully attempted to burn the clothes and shoes he was wearing during the attack.[3] Taylor eventually

---

[3]Lawrence Black, one of Grossman's neighbors, testified that he saw a fire behind the Grossman house on the evening of December 14, 1984. Black said he saw Grossman and another man carrying things out of the house and burning them in the yard. Black could not see exactly what items Grossman and his accomplice were burning.

discarded those items in a nearby lake. The next day, Grossman and Taylor thoroughly cleaned the van they were driving on the night of the murder and changed the tires on the vehicle.

Approximately one week later, on December 20, 1984, Grossman and Taylor told the story of the shooting to yet another friend, Brian Allan. Then, on December 25, Hancock, who testified that he was scared of Grossman, went to the police and told them what he knew. Shortly thereafter, Grossman and Taylor were arrested. Upon his arrest, Taylor confessed to the police and gave them a similar and detailed account of the events that took place on the night of the murder. After Grossman was arrested, but before he was tried, Grossman told the story of the killing, and his central role in it, to still one more person, fellow inmate Charles Brewer.

Grossman and Taylor were charged with first-degree murder, and, over Grossman's objections, were tried together. The state introduced significant physical and forensic evidence. A latent prints examiner testified that Grossman's fingerprints were found on the driver's door handle of Officer Park's vehicle and on her flashlight.[4] Brian Moyer, a deputy sheriff in Pasco County, testified that Brian Hancock led him to the location of two guns buried in a wooded area of

---

[4]Taylor's fingerprints were also recovered from the driver's door handle of Officer Park's vehicle.

6

Pasco County. One was a semiautomatic pistol and one was a .357 magnum. The serial number on the .357 matched that of Officer Park's weapon.

The police had recovered two discharged bullets from the scene, one from inside a cup in Officer Park's vehicle and another from inside a wall of that vehicle. An FBI agent qualified as an expert in the field of elemental composition analysis tested the lead composition of those bullets and determined that it was identical to the lead composition of one bullet later recovered from Officer Park's gun.[5] Another FBI agent, qualified as a firearms and gunpowder expert, testified that the bullet recovered from the cup inside Officer Park's vehicle could only have been fired from her own gun.[6]

Dr. Edward Corcoran, an associate medical examiner for Pinellas County, conducted an autopsy on Officer Park. The doctor testified that she died of a single gunshot wound to the head. The shot made an entrance wound in the back of her head on the left side and an exit wound in the right temporal region. He said that the bullet went in at about a 45 degree angle from the left back to the right side,

---

[5]Four bullets were subsequently recovered from Officer Park's gun. Three of them had identical lead compositions. One had a slightly different composition, and it was that bullet that matched the two discharged bullets recovered from the scene.

[6]The agent testified that the other bullet, which had been fired into the metal wall of the vehicle, was damaged. He was able to say that it had been fired from a .357 caliber weapon, which is the kind of weapon Officer Park carried that night, but was not able to definitively establish that it was fired from Officer Park's gun. There were no fingerprints recovered from any of the weapons.

7

with a slight deviation upwards of about 10 degrees.  In the doctor's opinion, "this would indicate that the bullet went in, someone holding the gun down firing upwards, or else the gun going in and the head bent over."

Dr. Corcoran testified that in addition to the gunshot wounds, he discovered two lacerations on the top of the right side of the head, a laceration on the back right side of the head, three large defects on the top left side of the head, a bruise on the right side of the forehead, small bruises on the chin, a scrape on the left cheek, a bruise on the left shoulder, bruises and scrapes on the right hand, a scrape on the left hand near the knuckles, and small bruises around the knees and thigh. There was hemorrhaging inside the scalp and extensive fracturing of the skull.  The doctor testified that the skull fractures were caused by the bullet.  Some of the lacerations on the head were caused by the bullet, and others were caused by external blunt trauma.

Finally, the state introduced the charred shoes; the two weapons; testimony from Black, the neighbor who observed the fire outside Grossman's home; and extensive testimony regarding Grossman's efforts to clean his van and change the van's tires.  The state also presented expert testimony as to the significance of blood spatter evidence.[7]

---

[7]An investigator from the medical examiner's office testified that blood spatter evidence in the victim's vehicle indicated that when she was shot, Officer Park was probably standing

In addition to the physical evidence, the state introduced the testimony of Hancock, Allan, and Brewer, and the details of Taylor's confession to the police. Because Grossman claims that he was prejudiced by the admission of Taylor's confession at their joint trial, we recount at some length the powerful similarities between Taylor's confession, on one hand, and the trial testimony of Hancock, Allan, and Brewer, describing what Grossman told them about the crime, on the other.

Hancock testified that Grossman and Taylor "come back, they run through the door. Grossman was covered full of blood with two guns in his hand saying he just shot a police officer. . . . Grossman told me he shot a police officer. And Tommy told me the same thing." Hancock added that Grossman told him that Grossman shot the officer because he did not want to go back to prison.[8]

_____

outside the vehicle with her head above the driver's seat, facing the interior of the vehicle, probably toward the area of the radio.

[8]Grossman's attorney cross-examined Hancock about this point and got Hancock to admit that Grossman did not actually say, on the night of the murder, that he shot the officer because he did not want to go back to prison. Hancock clarified that he had engaged in numerous conversations with Grossman during which Grossman told Hancock that he did not want to go back to prison. The jury heard the following exchange on cross-examination, which best encapsulates Hancock's testimony on this point:

| Q (Defense Counsel McCoun): | These are -- your testimony with regards to that point about his fear about going back to jail, you've already told the jury that was something that he didn't say, but something that you surmised or determined in your mind; correct? |
|---|---|

9

Hancock further testified that when he was alone with Grossman he asked Grossman specifically what had happened. Grossman provided a detailed account of the circumstances surrounding the murder. He explained that when Officer Park came upon Grossman and Taylor she asked what they were doing, and whether they had any guns. They denied having any firearms. Park asked both Grossman and Taylor to step outside the vehicle and proceeded to search it. She found a gun under Grossman's seat and placed him under arrest. Grossman pleaded with her not to arrest him because he was on parole. As she went to call in the incident on her radio Grossman hit her on the head with her flashlight, perhaps as many as twenty or thirty times. Grossman called Taylor for help, who then grabbed Park's legs. The officer then kicked Taylor in the groin, pulled out her .357 magnum, and got off one shot, which grazed Taylor. Grossman grabbed Officer Park's weapon

---

A (Brian Hancock):      No. He told me several times before the shooting ever -- before he even killed her he said that, he would never go back to jail.

Q:    I appreciate that. He had been to prison one time and he did not like it; right?

A:    That's right.

Q:    Okay. But he never told you, sir, that that was the reason why this lady was killed, did he? That's just something that you figured out?

A:    That's right.

10

from her hand and shot her in the head at point blank range. He then took back the nine-millimeter weapon lying on the seat, along with the officer's weapon, and with Taylor, fled in his van. The next day Grossman and Taylor washed and cleaned the van and changed its tires.

Allan testified that he met up with Grossman and Taylor on December 20, 1984, after returning to Pasco County from Jacksonville, where he had been serving a probationary sentence at a halfway house. Grossman showed Allan a newspaper article detailing the account of Officer Park's death, and told Allan, "I did it, man, I killed her."

According to Allan's testimony, Grossman told him that Officer Park had found a firearm in his van. Thereafter, she walked back to her vehicle and said, "Mr. Grossman, you are going back to prison." Grossman pleaded with the officer not to arrest him, but she persisted. Allan testified that "Martin grabbed the flashlight and repeatedly hit her over the head. Couldn't get a good grip, couldn't get a good hit, so, he got a better grip on the flashlight and hit her a couple more times." Grossman, while attacking Officer Park, yelled to Taylor, "Tom, she still won't go. Tom, she still won't go." After thinking he had beaten her into unconsciousness, Grossman told Allan, he let go of the officer, at which point she pulled out her gun and fired the shot that narrowly missed hitting Taylor. Then,

11

Allan recounted, Grossman "had her around the neck, and he grabbed her gun, ripped it out of her hands, let her go." Like Hancock, Allan testified that he, too, had conversations with Grossman, prior to the murder, during which Grossman told him that he did not like prison and did not want to go back.

Charles Brewer, a fellow inmate of Grossman's, testified that Grossman gave him a magazine article detailing the facts of the murder, but that Grossman complained about some inaccuracies in the account. Thus, for example, the article indicated that Officer Park was shot in the back of the head, and Grossman told Brewer "[t]hat was a damned lie. It was in the side of the head." Like Hancock and Allan, Brewer testified that Grossman admitted that he grabbed Park's flashlight, struck her in the head with it, and shot her once in the head with her own weapon. Brewer also testified that Grossman told him he did not want to be arrested by a female officer and that he did not want to go back to jail.

Finally, the state introduced only against Taylor the testimony of Wayne Desmarais, a detective with the Pinellas County Sheriff's Department, who took Taylor's confession. It is this testimony that Grossman claims prejudiced his trial. Taylor told the detective that he and Grossman had driven to the Covered Bridge Estates area of Pinellas County on the night of December 13, 1984, so that they could shoot a nine-millimeter weapon. Before they could begin firing, Officer

12

Park drove up to the location, exited her vehicle, and asked Grossman for his driver's license. Officer Park asked Grossman and Taylor to step out of their van and stand to the side while she searched the vehicle. She asked if they had any guns, and they replied they did not. Grossman told her that he was on probation,[9] that he did not want any trouble, and that he did not want to go back to jail. Officer Park soon found the nine-millimeter gun in the van and told Grossman he was under arrest.

The detective testified that Taylor told him he then lost sight of Grossman and Officer Park for a short period.[10] Taylor heard Grossman yelling his name, and he went over to the officer's vehicle, where Grossman had Officer Park pinned down on the driver's seat. Grossman was on top of Officer Park, and he was hitting her head with an aluminum flashlight she had been carrying. Officer Park was kicking her legs frantically, and Taylor attempted to stop her. Officer Park managed to draw her weapon and fire one shot that narrowly missed hitting Taylor in the head, while simultaneously kicking him in the groin. Taylor said that he was lying on the ground and saw Grossman take Officer Park's gun and fire one round into the back of her head. Taylor then retrieved Grossman's license and the nine-

[9]Taylor was unsure whether Grossman used the word "probation" or "parole."

[10]According to Taylor, his vision was obscured by the glare from the headlights on Officer Park's vehicle.

13

millimeter weapon from the officer's car, Grossman and Taylor returned to their van, and they left the scene. The detective testified that Taylor confirmed the firearms were buried near the crime scene and that the clothes Grossman wore at the crime scene had been discarded in a lake.

The defense called no witnesses at the guilt phase. The trial judge instructed the jury on premeditation and felony murder based on escape and the robbery or burglary of Officer Park's gun and the seized driver's license. The jury returned a general verdict of first-degree murder against Grossman and a general verdict of third-degree murder against Taylor.

At the penalty phase of Grossman's capital trial, the state did not present any additional evidence. The defense presented the testimony of Myra Grossman, Martin Grossman's mother, who said that her son was a non-violent person who helped to care for his father (who died when Martin was only fifteen years old). She recounted that Martin Grossman did not complete junior high and that she loved her son. Grossman also presented the testimony of Thomas Campbell, a detention officer from the Pinellas County Sheriff's Office, who stated that Grossman did not cause any problems while he was incarcerated. Carolyn Middleton, a correctional social worker, provided similar testimony, noting that Grossman was respectful to guards and able to express emotions. Finally,

14

Grossman's best friend, Steven Martakas, testified that he considered Martin to be like a brother and recounted that Grossman was respectful to his mother and had always encouraged him to avoid smoking and taking drugs.

The jury unanimously recommended, and the trial judge agreed, that Grossman should be sentenced to die. The trial judge expressly found, as aggravating circumstances, that Grossman committed the murder while committing the crime of robbery or burglary, that the murder was committed for the purpose of avoiding lawful arrest or escaping from custody, and that the murder was especially wicked, evil, atrocious or cruel. The only mitigating circumstance, the trial court observed, that "could have been found" based on the testimony was that the defendant was nineteen years old at the time the murder was committed. The judge squarely rejected this factor, concluding that it did not "constitute[] a mitigating circumstance in this case." The trial court then determined that "the aggravating circumstances far outweigh[ed] the mitigating circumstances" and sentenced Grossman to death.

## II.

Grossman commenced his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and, therefore, the provisions of that Act

15

govern this appeal. Wade v. Battle, 379 F.3d 1254, 1259 (11th Cir. 2004). Under AEDPA, Grossman was required to obtain a Certificate of Appealability ("COA") before he could appeal the district court's decision, see 28 U.S.C. § 2253(c)(1)(A), and "appellate review is limited to the issues specified in the COA." Murray v. United States, 145 F.3d 1249, 1251 (11th Cir. 1998). Therefore, our review is limited to the three issues noted in the COA.

When examining a district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error. Maharaj v. Sec'y for Dep't of Corr., 432 F.3d 1292, 1308 (11th Cir. 2005), cert. denied, — S. Ct. — (Oct. 2, 2006) (No. 05-1555). However, in reviewing the decisions of the Supreme Court of Florida, we are governed by the explicit terms of AEDPA, which provides that we may grant a writ of habeas corpus only if 1) the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or 2) the state decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The phrase "clearly established Federal law," as used in § 2254(d)(1), encompasses only the holdings of the Supreme Court of the United States.

16

Williams v. Taylor, 529 U.S. 362, 412 (2000) (holding that the language of §

2254(d)(1) expressly "restricts the source of clearly established law to [the

Supreme Court's] jurisprudence"). "Clearly established federal law is not the case

law of the lower federal courts, including this Court." Putman v. Head, 268 F.3d

1223, 1241 (11th Cir. 2001). And, clearly established federal law "refers to the

holdings . . . of [the Supreme Court's] decisions as of the time of the relevant state-

court decision." Williams, 529 U.S. at 412 (emphasis added).

"Moreover, section 2254(d)(1) provides two separate bases for reviewing

state court decisions; the 'contrary to' and 'unreasonable application' clauses

articulate independent considerations a federal court must consider." Maharaj, 432

F.3d at 1308. A state court decision is contrary to clearly established federal law if

either "(1) the state court applied a rule that contradicts the governing law set forth

by Supreme Court case law, or (2) when faced with materially indistinguishable

facts, the state court arrived at a result different from that reached in a Supreme

Court case." Putman, 268 F.3d at 1241. An "unreasonable application" of clearly

established federal law may occur if the state court "identifies the correct legal rule

from Supreme Court case law but unreasonably applies that rule to the facts of the

petitioner's case." Id. "An unreasonable application may also occur if a state court

unreasonably extends, or unreasonably declines to extend, a legal principle from

17

Supreme Court case law to a new context." Id.

Finally, a federal court may grant a writ of habeas corpus to a state prisoner when the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's determination of the facts, however, is entitled to substantial deference. 28 U.S.C. § 2254(e)(1) (noting that "a determination of a factual issue made by a State court shall be presumed to be correct" and that an "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence").

### III.

As we have noted, Grossman was jointly tried with co-defendant Taylor. Grossman made numerous motions to sever, each of which was denied by the state trial judge. Plainly, Grossman did not want the jury to hear the inculpatory statements co-defendant Taylor made to the police shortly after Taylor was arrested, even though the trial court found them admissible against only Taylor. Because Taylor did not testify, Grossman had no opportunity to cross-examine Taylor about those statements, and, accordingly, Grossman contends his Sixth Amendment right of confrontation was violated.

This argument was rejected by the Supreme Court of Florida on direct

18

appeal.  We quote from its analysis in some detail to show that the Supreme Court

of Florida's determination was neither contrary to nor an unreasonable application

of clearly established federal law:

> Appellant and his codefendant were tried jointly, and neither testified at trial.  Codefendant Taylor's statement to the police was introduced into evidence against Taylor only and the jury was instructed that this statement could not be used against appellant.  This was done on the rationale that Taylor's statement interlocked with the three statements that appellant made to witnesses Hancock, Allan, and Brewer.  At the time of trial this appeared to be permissible under Parker v. Randolph, 442 U.S. 62, 99 S. Ct. 2132, 60 L. Ed. 2d 713 (1979), where a plurality of the court held that interlocking confessions of codefendants could be introduced in a joint trial as an exception to Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), without violating the confrontation clause of the sixth amendment, provided the jury was instructed that the codefendant's statement could only be used against the codefendant.  The plurality view of Parker has since been rejected and we must examine this issue in light of Cruz v. New York, [481 U.S. 186], 107 S. Ct. 1714, 95 L. Ed. 2d 162 (1987).

> Parker was decided on the theory that introduction of the confession of a non-testifying codefendant against the codefendant only, which interlocked with a confession of the defendant, was permissible in a joint trial because it presented nothing of evidentiary value against the defendant which was not already properly before the jury.  Consequently, the theory went, the jury could reasonably be expected to follow an instruction that it should not use the non-testifying codefendant's confession against the defendant and, even if it did not, the error would be harmless.  In rejecting this theory, the majority in Cruz reasoned:

>> Quite obviously, what the "interlocking" nature of the codefendant's confession pertains to is not its harmfulness but rather its reliability: If it confirms

19

essentially the same facts as the defendant's own confession it is more likely to be true. Its reliability, however, may be relevant to whether the confession should (despite the lack of opportunity for cross-examination) be admitted as evidence against the defendant, see Lee v. Illinois, 476 U.S. 530 [106 S. Ct. 2056, 90 L. Ed. 2d 514] (1986), but cannot conceivably be relevant to whether, assuming it cannot be admitted, the jury is likely to obey the instruction to disregard it, or the jury's failure to obey is likely to be inconsequential.

107 S. Ct. at 1718-19 (emphasis in original). The Court then went on to make three holdings, all of which are applicable here. First, it is error to admit a non-testifying codefendant's confession incriminating the defendant notwithstanding an instruction not to consider it against the defendant. This is so even if the defendant's own interlocking confession is admitted. Second, the defendant's confession may be considered as an indica of reliability in determining whether the codefendant's confession may be directly admissible against the defendant. Third, in recognition that its ruling would impact on trials already conducted under the Parker theory, the Court held that the defendant's confession could be considered on appeal in determining whether admission of the codefendant's confession was harmless.

It is clear from Cruz that admission of Taylor's statement with instructions that it not be used against appellant was error. It is also clear from the record that this error was harmless. Taylor's statement interlocks with and is fully consistent in all significant aspects with all three statements that appellant made to Hancock, Allan, and Brewer and which were directly admissible against appellant. The indicia of reliability are sufficient to have permitted introduction of Taylor's statement as evidence against appellant. Appellant makes two arguments that this is not so, both of which are contrary to the record. First, he argues that it is only Taylor's statement which emphasizes appellant's primary role in the murder. This is contrary to the record which shows that appellant told Hancock, Allan, and Brewer that it was he who first attacked and battered the officer and that it was he who wrestled her weapon away and fired the single shot which killed

20

her. In all three statements, Taylor's role is clearly subordinate while appellant's role as the initiator and triggerman is dominant. Second, appellant argues, he and Taylor jointly recounted the story of the murder to Hancock and Allan and neither witness was able to identify for the court which defendant said what. This is contrary to the record which shows that the witnesses were able for the most part to identify appellant as the person who narrated the critical elements of the story. Moreover, even if this were not true, the joint statements of appellant and Taylor given in each other's presence would be admissible against both as admissions against penal interest. We hold that it was error to admit Taylor's statement in the joint trial as evidence against Taylor only, but that this error was harmless under the facts and circumstances of the case. Cruz; Harrington v. California, 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969).

Grossman I, 525 So. 2d at 838-39.

In short, the Supreme Court of Florida held that the admission of Taylor's confession at a joint trial with Grossman, even with instructions to disregard the statement as to Grossman, was error under Cruz, but that the error was harmless. On habeas review, the district court concluded that the Supreme Court of Florida had identified the appropriate Supreme Court case law (Cruz), and that the application of the Cruz principles was not objectively unreasonable. Specifically, the district court found that although it was error under Cruz to admit Taylor's statement, even with the limiting instruction, it was harmless because "Taylor's statements were fully consistent with Grossman's statements [to Hancock, Allan, and Brewer], which were properly admitted against Grossman." Grossman III, 359 F. Supp. 2d at 1253.

21

Grossman argues, nevertheless, that: 1) the admission of Taylor's statement was constitutional error; and 2) the error was fatally prejudicial in light of the Supreme Court's recent decision in Crawford v. Washington, 541 U.S. 36 (2004). As for his first argument, we agree with Grossman, the Supreme Court of Florida, and the district court that admission of Taylor's statement was erroneous. In Cruz, the Supreme Court held that "where a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if the defendant's own confession is admitted against him." 481 U.S. at 193 (citation omitted).

The factual circumstances described in Cruz largely mirror what occurred in this case. Taylor did not testify, yet his statement to the police, which implicated Grossman, was admitted against Taylor with instructions to disregard the statement as to Grossman, precisely because it interlocked with Grossman's confessions to Hancock, Brewer, and Allan. Plainly, there was Cruz error. Nevertheless, that alone does not entitle Grossman to habeas relief; as Cruz made abundantly clear, "the defendant's confession may be considered . . . on appeal in assessing whether any Confrontation Clause violation was harmless." Cruz, 481 U.S. at 193-94. The Supreme Court of Florida determined that the error was harmless. The evidence

22

was overwhelming and Taylor's statements interlocked with and were consistent in all significant aspects with each of the three detailed and inculpatory statements Grossman made to Hancock, Allan, and Brewer.

On direct appeal, the Supreme Court of Florida specifically found that the Cruz error was harmless beyond a reasonable doubt. See id. at 839 (citing Harrington v. California, 395 U.S. 250 (1969), which analyzed whether a Confrontation Clause error raised on direct appeal was harmless beyond a reasonable doubt). However, in a habeas corpus proceeding under 28 U.S.C. § 2254, we analyze Grossman's claim under a different harmless error standard of review: whether the Confrontation Clause error alleged in this case "had substantial and injurious effect or influence in determining the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (internal quotation marks omitted).

In Brecht, the Supreme Court held that constitutional trial errors raised collaterally in a habeas proceeding are subject to the harmless error standard enunciated in Kotteakos v. United States, 328 U.S. 750 (1946), where it opined that an error is harmless unless the error "had substantial and injurious effect or influence in determining the jury's verdict." Id. at 776. In Brecht, the Supreme Court noted the differences between the Kotteakos harmless error standard and the

23

"harmless beyond a reasonable doubt" standard, and determined that the harder-to-establish Kotteakos formulation was more appropriate in the habeas context, which is designed to afford relief only to those whom society has "grievously wronged." Brecht, 507 U.S. at 637. The Brecht Court cited as compelling factors "the State's interest in the finality of convictions that have survived direct review within the state court system," principles of "comity and federalism," the need to avoid degrading the significance of trial or encouraging relitigation of claims, the character of habeas corpus as an unusual remedy, and the social costs and practical difficulties of retrying a defendant after a grant of habeas relief. See id. at 635-37.

Since then, we have had occasion to say more than once that the Brecht standard governs harmless error analysis in habeas corpus cases involving Cruz violations and other Confrontation Clause transgressions associated with the improper admission of out-of-court statements. See Glock v. Singletary, 65 F.3d 878, 891 (11th Cir. 1995) (en banc) (adopting the harmless error analysis of the vacated panel opinion, which had applied the Brecht standard to a Cruz claim presented in a state habeas petition filed pursuant to § 2254); see also Washington v. Crosby, 324 F.3d 1263, 1266 n.2 (11th Cir. 2003) ("Even if we assumed that the district court did not err in finding a Confrontation Clause violation, we would hold that the violation was harmless under Brecht. . . ."); McIntyre v. Williams,

24

216 F.3d 1254, 1258-59 (11th Cir. 2000) (stating in dictum that "admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Confrontation Clause" is trial error subject to Brecht harmless error analysis); Cargill v. Turpin, 120 F.3d 1366, 1375-76 (11th Cir. 1997) (concluding that admission of a statement for purposes other than proving the truth of the matters contained in the statement did not violate the Confrontation Clause, but finding that even if there had been an error, it would have been harmless under the Brecht standard); Cumbie v. Singletary, 991 F.2d 715, 724 (11th Cir. 1993) (applying Brecht harmless error analysis to erroneous admission of one-way video testimony); cf. Ventura v. Att'y Gen., 419 F.3d 1269, 1279 n.4 (11th Cir. 2005) (noting the difference between the harmless error standards of review and opining that the "beyond a reasonable doubt" formulation "has little application to a case before us on collateral review"). Thus, the Brecht formulation provides the standard against which to measure harmless error in this case.[11]

Grossman offers no convincing explanation for why we should find that the admission of Taylor's inculpatory statement was harmful. The evidence against

---

[11]It is of no moment that Brecht was decided after Grossman's direct appeal in the state courts had run its course and while state collateral proceedings were pending. Notably, Grossman's federal habeas corpus proceedings commenced after Brecht was decided. Indeed, the Supreme Court and our court have applied Brecht even in those cases where the federal habeas action was commenced before Brecht was decided. See Brecht, 507 U.S. at 638 (applying the Brecht rule in Brecht itself); Cumbie, 991 F.2d at 724 (applying the Brecht standard in a case in which the panel heard oral arguments before Brecht was decided).

25

him -- both physical and testimonial -- was overwhelming. Grossman's fingerprints were found on the door handle of the officer's vehicle and, significantly, on her flashlight. One of Grossman's neighbors testified that he observed a fire outside Grossman's home, and the state introduced the charred shoes that Grossman attempted to destroy. And, most importantly, each of the recitations Grossman separately gave to Hancock, Allan, and Brewer duplicates each important aspect of Taylor's confession -- that Grossman was the one who first attacked the officer, repeatedly beating her with a metal flashlight; that it was Grossman who gained control of the officer's weapon; that Grossman played the dominant role, as the Supreme Court of Florida put it; and that Grossman fired the fatal shot. More specifically, Hancock testified that Grossman told him that Grossman followed the officer to her car, repeatedly struck her with her flashlight, took the officer's gun away from her, and shot her at point blank range. Allan's testimony likewise established that Grossman related the same basic facts he had told Hancock. Finally, as the district court observed, "Grossman admitted the same motivation in statements to fellow inmate Brewer" -- to avoid going back to jail. In light of the overwhelming physical and testimonial proof, we cannot say the <u>Cruz</u> error had a substantial and injurious effect or influence in determining the

jury's verdict.[12]

The long and short of it is that the Supreme Court of Florida reasonably determined that the admissibility of Taylor's statement amounted to harmless error.

Grossman argues, however, that his inability to cross-examine Taylor constituted harmful error under the Supreme Court's recent decision in Crawford. This claim fails for two reasons. First, we have held that under the Supreme Court's analysis in Teague v. Lane, 489 U.S. 288, 310 (1989), Crawford does not apply retroactively to cases on collateral review. Espy v. Massac, 443 F.3d 1362, 1367 (11th Cir. 2006) (holding that "Crawford did not announce a watershed rule of criminal procedure, and it therefore does not apply retroactively to cases on collateral review"). Second, it fails because AEDPA requires us to consider only

---

[12]The Supreme Court of Florida also determined that Taylor's statement was entirely consistent with the detailed confessions Grossman made to Hancock, Brewer, and Allan, and thus that there were sufficient indicia of reliability to have admitted Taylor's statement directly against Grossman. See Ohio v. Roberts, 448 U.S. 56, 65-66 (1980) (holding that admission of a statement from an unavailable hearsay declarant does not violate the Confrontation Clause so long as there are sufficient indicia of reliability supporting the statement); see also Lee v. Illinois, 476 U.S. 530, 545 (1986) (holding that "[i]f those portions of [a] codefendant's purportedly 'interlocking' statement which bear to any significant degree on the defendant's participation in the crime are not thoroughly substantiated by the defendant's own confession, the admission of the statement" violates the Confrontation Clause (emphasis added)). Notably, Cruz did not disturb the holdings of Roberts and Lee, which were undeniably good law at that time. Cruz, 481 U.S. at 193-94 (observing that "the defendant's confession may be considered at trial in assessing whether his codefendant's statements are supported by sufficient 'indicia of reliability' to be directly admissible against him . . . despite the lack of opportunity for cross-examination" and citing Lee). The Supreme Court of Florida's finding that there were sufficient indicia of reliability to have permitted the admission of Taylor's statement directly against Grossman also was neither contrary to nor an unreasonable application of clearly established federal law.

27

clearly established federal law, which "refers to the holdings . . . of [the Supreme Court's] decisions <u>as of the time of the relevant state-court decision</u>." <u>Williams</u>, 529 U.S. at 412 (emphasis added); <u>Hart v. Att'y Gen.</u>, 323 F.3d 884, 891 (11th Cir. 2003); <u>Putman</u>, 268 F.3d at 1241. Because <u>Crawford</u> was decided in 2004, nearly sixteen years after the Supreme Court of Florida issued its opinion on the severance issue in 1988, it does not qualify as clearly established federal law that we may consider.[13] Simply put, the Supreme Court's decision in <u>Crawford</u> cannot affect our analysis. We, therefore, agree with the district court that the state court's decision was neither contrary to nor an unreasonable application of clearly established federal law, and that it was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

**IV.**

Grossman's next habeas claim is that the state prosecutor erroneously failed to disclose exculpatory material concerning witnesses Brewer, Hancock, and Allan. Grossman raised this issue in his state post-conviction proceeding and presented evidence at a hearing conducted by the state trial judge. The state court squarely

---

[13]We need not decide the extent to which AEDPA codifies the exceptions to non-retroactivity set forth in <u>Teague</u>, see <u>Teague</u>, 489 U.S. at 311, because, under <u>Teague</u>, <u>Crawford</u> is not retroactively applicable to cases on collateral review. See <u>Mungo v. Duncan</u>, 393 F.3d 327, 334-35 (2d Cir. 2004) ("In any case, whether § 2254(d)(1) was intended, or out of prudence should be read, to adopt the <u>Teague</u> exceptions is a question we need not answer because we conclude that the <u>Crawford</u> rule does not qualify as a watershed rule coming within the exception to <u>Teague</u>.").

28

rejected Grossman's Brady claims and the Supreme Court of Florida affirmed. See Grossman II, 708 So. 2d at 251. The district court similarly found that there were no Brady violations. Grossman III, 359 F. Supp. 2d at 1261-63.

In Brady, the Supreme Court set forth the now firmly-established constitutional rule that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady, 373 U.S. at 87. Indeed, the "duty to disclose such evidence is applicable even though there has been no request by the accused, and . . . the duty encompasses impeachment evidence as well as exculpatory evidence." Strickler v. Greene, 527 U.S. 263, 280 (1999) (citation omitted). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). The state post-conviction court and the Supreme Court of Florida recognized Brady as establishing the relevant law, and Grossman does not claim any error in that regard; instead, he contends that the state courts unreasonably applied Brady and its progeny to the facts of this case. We disagree.

Grossman first says that the state withheld exculpatory information that it had cut a deal with Brewer to give him assistance on other charges in exchange for

29

his testimony, that the state attorneys knew Brewer's testimony was false, and that Brewer was an agent of law enforcement, as well as information regarding the number of Brewer's prior convictions.

The state trial court took extensive evidence on this claim at a collateral hearing, and concluded that Brewer did not receive any deal in exchange for his testimony and was not acting as an agent of law enforcement. The court relied specifically on the hearing testimony of Pinellas County Detective Robert Rhodes and State Attorney Bernie McCabe, both of whom unambiguously said that there were no deals with Brewer. The Supreme Court of Florida affirmed for the reasons offered by the trial judge. Grossman II, 708 So. 2d at 251-52. The district court, in turn, found that the state court's conclusion was supported by "competent, substantial evidence presented at the hearing," Grossman III, 359 F. Supp. 2d at 1262, and we agree. Although Brewer testified that he had an agreement with the state, the state post-conviction court was entitled to credit the contrary testimony of the detective and the prosecutor, and we are obliged to defer to that fact-finding.

Grossman also says that Brewer provided false testimony at trial regarding what he heard from Grossman and about Brewer's prior convictions. The state court determined, however, that to the extent Brewer provided any false testimony at trial, the state was not aware of the falsehood, and that Grossman failed to show

30

how the alleged falsities affected the conviction or the sentence. The Supreme Court of Florida again affirmed, and we agree with the district court that the state court's conclusions are supported by substantial, competent evidence. Grossman offers us no argument other than the testimony of Brewer himself, which stands in stark contrast to the accounts provided by the police detective and state attorney. Moreover, he does not begin to establish how the evidence was material -- that is, how there is a reasonable probability that the outcome would have been different if the alleged falsities had been disclosed.[14] As the district court correctly noted, the evidence of Grossman's guilt was "overwhelming." Grossman III, 359 F. Supp. 2d at 1263.

Grossman also alleges that the state, again in violation of Brady, failed to disclose that: 1) his friend and roommate Brian Hancock had charges pending against him in Martin County; 2) Hancock was interested in receiving reward money in exchange for his testimony; and 3) the police instructed Hancock to

---

[14]The parties have argued this issue under the rubric of Brady. Some of Grossman's arguments come close to alleging Giglio error, "a species of Brady error that occurs when the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury." Ventura v. Att'y Gen., 419 F.3d 1269, 1276-77 (11th Cir. 2005) (internal quotation marks omitted). The materiality standard under Giglio is less stringent than under a garden variety Brady claim; under Giglio, a failure to disclose evidence is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Ventura, 419 F.3d at 1278 (internal quotation marks omitted). But, whether we evaluate Grossman's claim under Brady or Giglio, the outcome is the same; the allegedly withheld evidence was not material.

31

testify that Grossman told him he hit Officer Park "20 to 30 times" with her flashlight. The state court rejected each claim.

In the first place, the state trial judge found that Hancock did not lie at trial about his Martin County arrest and that Hancock purposefully withheld the details of that incident from the Pinellas County authorities. The state court also found that Hancock never lied about any reward money and that his testimony concerning the number of times Grossman hit Officer Park was based on information he learned from Grossman, not information he got from the police. The Supreme Court of Florida affirmed, and the district court again concluded that the findings were supported by substantial testimony from the post-conviction hearing.

At trial, the prosecutor asked Hancock if "anyone promised you anything with regard to any possible charges you might have faced for your involvement in this case" and Hancock answered, "No, they haven't." On cross-examination, the defense attorney asked Hancock, "You have not been arrested in this incident, you have not been charged with anything during the past ten months, have you?" Hancock answered, "No, I have not." According to Hancock, he had been arrested in Martin County for disorderly conduct shortly before he testified. Hancock claimed that he told Pinellas County officials about the arrest. Eventually -- it is not clear when -- Hancock failed to appear on the disorderly conduct charges and

32

was sentenced to 45 days in jail.

It is not clear from the record whether Hancock lied when he said he had not been "charged" with anything in the previous ten months. First, the initial part of the question ("You have not been arrested in this incident, . . . have you?") expressly asked about this incident (i.e., the murder), and the disorderly conduct arrest was unrelated to the killing of Officer Park. Moreover, it is not clear whether Hancock had been charged with disorderly conduct when he testified. He had been arrested at that point, but it is unclear when he was formally charged. Regardless of whether he lied, however, we agree with the district court's conclusion, that even if the state knew about the Martin County arrest, and even if the state withheld that information, there was no Brady error because there is no possibility that the result of the proceeding would have been different if the defense knew about that arrest.[15]

As for the reward money and the testimony about the number of times Grossman struck Officer Park, the state court's conclusions are adequately supported by the post-conviction testimony of Pinellas County Detective Robert Rhodes, Detective John Halliday, and State Attorney McCabe. Again, the state court's decision was neither an unreasonable application of clearly established

---

[15]Again, the evidence was not material regardless of whether we evaluate Grossman's claim under Brady or Giglio.

federal law nor an unreasonable determination of the facts.

Finally, Grossman maintains that the state failed to disclose that Brian Allan was the subject of a criminal investigation when he testified. At the state court post-conviction hearing, a sergeant with the Pasco County Sheriff's Office testified that he first began investigating Allan on September 9, 1985, at which time he purchased a small amount of marijuana from Allan. Allan was arrested soon thereafter by the Pasco County officers on October 31, 1985 -- the same day that the penalty phase of Grossman's trial began. The Pasco County sergeant said it was three to four days later before he learned that Allan was a witness in Grossman's case, at which time he notified the state attorney's office.

The state trial court found that the state did not know of the Allan investigation and that it would not have been helpful for impeachment purposes. The Supreme Court of Florida affirmed. Grossman does not explain why that ruling was erroneous; he simply restates the facts noted above. We agree with the district court that there was no Brady violation; there is simply no evidence that the prosecutors knew about the Allan investigation. But, even if the state did know about the investigation, and even if the information could have been used for the purposes of impeachment, there is no real possibility that the result of the proceeding would have been different.

In short, the Supreme Court of Florida correctly determined the relevant federal law, applied that law in a reasonable manner, and did not make any unreasonable factual determinations in rejecting Grossman's Brady claims.

**V.**

Finally, Grossman maintains that he received ineffective assistance of counsel because his attorneys did not effectively prepare for the penalty phase of the trial, failed to object to the state's presentation of non-statutory aggravating factors, failed to object to the state's use of a "Golden Rule" argument, and did not present an effective closing argument. Grossman argues that his attorneys should have interviewed more of his family and friends, and he offers affidavits from thirty-three individuals he contends could have provided mitigation testimony at the penalty phase. After painstaking review, the district court concluded that Grossman received effective assistance at the penalty phase, and we agree.

Ineffective assistance claims are governed by the well-established standard enunciated in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Supreme Court held that to prevail on an ineffective assistance claim, a criminal defendant must show both that counsel's performance was deficient and that counsel's performance prejudiced the defense. Id. at 687. The Florida courts recognized and followed the Strickland standard in this case, and Grossman does

35

not contend otherwise. Rather, he says that the Florida courts unreasonably determined that, based on the facts of this case, counsel's performance at the penalty phase was constitutionally sufficient.

Grossman argues that his two trial attorneys were ineffective because they failed to interview family and friends who could have provided beneficial testimony at the penalty phase. His attorneys erred, he says, in relying on only three sources for potential penalty phase witnesses -- Grossman himself, his mother, and his grandmother -- and he put forth thirty-three additional mitigating affidavits. The Supreme Court of Florida rejected this claim, and in doing so quoted at length from the state post-conviction court's opinion:

> The Court has weighed all the above matters in light of Strickland v. Washington, 466 U.S. 668, [104 S. Ct. 2052, 80 L. Ed. 2d 674] (1984). The Defendant has failed to make the required showing of either deficient performance or sufficient prejudice to support his ineffectiveness claim.
>
> The Court has evaluated the conduct of the Defendant's counsel from counsel's perspective at the time of the trial. Defendant introduced thirty-three affidavits that were represented as possible mitigation witnesses that were available a[t] the time of trial but were not used by the defense. Several of the possible witnesses represented by the affidavits were known to the defense, and the defense had determined not to use them.
>
> Defense counsel, Mr. McCoun, at the time of trial recognized that while trying to present a favorable

36

picture of the Defendant, equally negative things would also be presented. Mr. McCoun did not want to use witnesses who would say that the Defendant was into stealing and heavy drug use. Moreover, defense counsel called three mitigating witnesses in addition to the Defendant's mother. The mitigating witnesses that were called had close contact with the defendant near the time that he committed the crime; whereas, many of the potential witnesses that were represented by the affidavits had not seen the Defendant in years.

The Court finds that Mr. McCoun did a competent, effective job of representing the Defendant at all phases of the trial. Even if counsel were deemed ineffective for the reasons stated by the Defendant, such alleged ineffectiveness did not come close to being so prejudicial to the Defendant that it affected the outcome of the case. The facts of this case showed the Defendant's conduct to be so egregious that proof of mitigating circumstances was extremely difficult.

The trial court applied the right rule of law governing ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), and competent substantial evidence supports its finding. We find no error.

Grossman II, 708 So. 2d at 251 (second alteration added and footnote omitted).

The standard governing counsel's performance is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. "We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately." White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992). "To state the obvious: the trial lawyers, in every

37

case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (internal quotation marks omitted). The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that no competent counsel would have taken the action that his counsel did take. See Marquard v. Sec'y for Dep't of Corr., 429 F.3d 1278, 1304 (11th Cir. 2005), cert. denied, 126 S. Ct. 2356 (2006). In judging the adequacy of counsel's investigation of potential mitigating circumstances, we consider "counsel's perspective at the time investigative decisions are made" and give "a heavy measure of deference to counsel's judgments." Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456, 2462 (2005) (internal quotation marks omitted).

The district court determined, we think properly, that Grossman's counsel did an effective and competent preparation for the penalty phase. Grossman's attorneys talked to Grossman, his mother, and his grandmother; attempted to develop other witnesses based on those conversations; notably researched Grossman's past addresses, and his educational, medical, and emotional background; located witnesses who had known Grossman while he was in jail and who could testify about his courteous, cooperative, and nonviolent demeanor; and

38

explored the possibility of mental mitigating facts with Dr. Sidney Merin.

Grossman's trial counsel presented four mitigating witnesses, including Myra

Grossman (Grossman's mother), Steven Nicholas Martakas (Grossman's best

friend), and two jail employees who interacted with Grossman while he was

incarcerated.[16]

As the district court recognized, "[t]he defense strategy for penalty phase

was to demonstrate that Grossman was not an animal but a young man with

positive characteristics who did not deserve to die." Grossman III, 359 F. Supp. 2d

at 1268. The district judge addressed the thirty-three affidavits this way, and, after

thorough review, we agree with her analysis:

> Many of the affidavits offered to support Grossman's argument in this case presented facts cumulative to the testimony of Myra Grossman and Steve Martakas. In addition, many of the affidavits, and much of the mitigation now suggested by the defense, were inconsistent with the penalty phase strategy, because the evidence would have reminded the jury of Grossman's negative character traits, such as his drug use and prior criminal history.
>
> The affidavits themselves were of limited evidentiary value. They are distinctly one-sided, and the testimony at the state evidentiary hearing established that the affiants had very limited

---

[16]These efforts far exceed those the Supreme Court found deficient in Rompilla. In that case, the Court found deficient performance where defense counsel failed to examine a prior conviction file that the state attorneys said they intended to use (and quote from) at the penalty phase. Rompilla, 545 U.S. 374, 125 S. Ct. at 2467. Here, Grossman does not allege that his counsel failed to review any files they knew the state would present at the penalty phase; indeed, the state presented no evidence at the penalty stage. More importantly, defense counsel undertook substantial efforts in preparation for the penalty phase.

knowledge of Martin Grossman. The affiants who knew Grossman as a child had lost touch with him after his family moved to New Port Richey, Florida. Some of the affidavits were identified as inaccurate; some affiants felt pressured into signing the statements, and many affidavits were based on speculation and information heard through other people.

Both Attorney McCoun's and Attorney Ira Berman's testimony revealed why they would not have used as witnesses many of the affiants, such as Rosol and Paul Melton, who were instrumental in turning Grossman in to the police. They chose not to put on witnesses who would have had negative things to say about Grossman or his mother, or who would have opened the door to testimony about Grossman's drug and alcohol abuse and his previous criminal activities. The testimony of the social worker, Kevin Sullivan, strategically would not have been presented for the same reason.

Id. at 1268-69 (citations and footnote omitted).

The district judge made clear that many of the affiants were rejected for sound and considered reasons. The practice of submitting post-hoc affidavits is not out of the ordinary, and it is not often successful:

It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or, if they were called, had they been asked the right questions. . . . But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance. . . . That other witnesses could have been called or other testimony elicited usually proves at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel. As we have noted before, in retrospect, one may always identify shortcomings, but perfection is not the standard of effective assistance.

40

The widespread use of the tactic of attacking trial counsel by showing what "might have been" proves that nothing is clearer than hindsight -- except perhaps the rule that we will not judge trial counsel's performance through hindsight. We reiterate: The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.

Waters v. Thomas, 46 F.3d 1506, 1513-14 (11th Cir. 1995) (citations, internal quotation marks, and alterations omitted). Grossman's counsel conducted an investigation, interviewed Grossman's family members and friends, had a strategy for the penalty phase, and called mitigation witnesses. The Supreme Court of Florida did not unreasonably apply clearly established federal law in finding the performance was not ineffective.

Moreover, we agree with the district court that even if the performance was ineffective, Grossman has not successfully established the prejudice prong of the Strickland analysis. As the Supreme Court of Florida held, the conduct of Grossman's attorneys "did not come close to being so prejudicial to the Defendant that it affected the outcome of the case." Grossman II, 708 So. 2d at 251 (quoting the state post-conviction court's opinion). The trial testimony shows that "Grossman committed outrageous and brutal acts against a young female wildlife officer, striking her repeatedly with her own flashlight and then shooting her in the head with her own gun." Grossman III, 359 F. Supp. 2d at 1270. Against a very

41

substantial array of evidence, there is simply no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. We can discern nothing unreasonable in the state court's determination on this point either.

Grossman also argues that counsel was ineffective for failing to object to the state's introduction of non-statutory aggravating factors. Specifically, he claims that the prosecution elicited prejudicial, irrelevant testimony from Myra Grossman about a time when Grossman allegedly vandalized Brian Hancock's car and when Grossman allegedly threatened to kill Hancock. As the district court noted, this testimony was proper rebuttal evidence, offered in response to Myra Grossman's direct testimony that Grossman, her son, was a normal, nonviolent person who acted wholly out of character when he murdered the victim. Counsel's performance was neither deficient nor prejudicial on this score.

Next, Grossman argues that counsel was ineffective for failing to object to the prosecution's improper use of a "Golden Rule" argument. "A 'golden rule' argument asks the jurors to place themselves in the victim's position, asks the jurors to imagine the victim's pain and terror or imagine how they would feel if the victim were a relative." Hutchinson v. State, 882 So. 2d 943, 954 (Fla. 2004). Grossman complains because the prosecutor, in closing argument, told the jury

42

there was "terror and pain" in the victim's voice when she made a transmission on her police radio, that Officer Park suffered fear and pain before she died, and that the blows to her head with the flashlight were "terrorizing," and because the prosecutor described the struggle that occurred before Officer Park died. The district court determined that these comments were not improper "Golden Rule" arguments because they were not designed to elicit sympathy for the victim, but rather were presented to the jury as relevant arguments in support of the "heinous, atrocious, or cruel" aggravating factor. We agree.

In Kennedy v. Dugger, the prosecutor offered the following argument to the jury: "Can you imagine, in your own living room not bothering a soul on a Saturday afternoon? He stopped up at his relative's house and had a beer and he walked back down to your own house, and, a total stranger, because you got in his way, destroys you." 933 F.2d 905, 913 (11th Cir. 1991). We found that was not an improper "Golden Rule" argument because it was relevant to the defendant's future dangerousness. Id. This case is even clearer, where the prosecutor was permitted to comment on those aspects of the crime that made this particular murder arguably heinous, atrocious, or cruel. Indeed, the prosecutor here never asked the jurors to place themselves in the victim's position; he simply described the circumstances of her death, which undeniably involved physical pain and

43

enormous emotional terror, circumstances that are plainly relevant to whether the murder was heinous, atrocious, or cruel. There was no "Golden Rule" violation, and Grossman's counsel did not provide deficient representation by failing to object.[17]

Finally, Grossman argues that his attorneys were ineffective because they did not present an effective closing argument. Grossman maintains that they should have presented additional mitigating factors and explained in greater detail why the aggravating factors were not satisfied. The district court rejected this claim and explained its reasoning in these terms:

> A review of defense counsel's closing argument refutes Grossman's claim of ineffectiveness based on the alleged inadequacy of the closing argument. While the defense may not have focused on emphasizing particular mitigating factors to current counsel's satisfaction, the overall theme of the closing argument was to repeatedly stress the penalty phase strategy emphasizing that Grossman was a normal child, with family and friends who cared about him; that he was not a morally corrupt beast and that this incident was totally out of character for him; and that his ability to behave appropriately in prison demonstrated that there was no need for him to be executed, as society would be protected by the imposition of a life sentence. Counsel also emphasized the gravity of the decision the jury was being asked to make and the importance of

---

[17]Moreover, we agree with the district court that even if there was error, there was no showing of prejudice. The comments were not a focal point of the closing argument, and, in light of the significant number of aggravating circumstances, there is no reasonable probability that the outcome would have been different if the prosecutor had not made them. See Bertolotti v. State, 476 So. 2d 130, 133 (Fla. 1985) (noting that because the jury's recommendation is only advisory, prosecutorial misconduct must be egregious before a new penalty phase is appropriate, and finding that an improper Golden Rule argument did not warrant re-sentencing).

44

disregarding feelings of anger, sympathy or revenge.

Grossman III, 359 F. Supp. 2d at 1272 (citations omitted). Grossman's attorneys presented a reasoned and rational theme to the jury during closing argument. That is all the Constitution requires. See Chandler, 218 F.3d at 1314 (noting that "counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy" (internal quotation marks omitted)).

## VI.

In short, the decisions of the Florida courts were neither contrary to nor unreasonable applications of clearly established federal law; nor were the decisions based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, we affirm the district court's denial of habeas relief.

**AFFIRMED**.