[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15344

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 14, 2011
JOHN LEY
CLERK

D. C. Docket No. 06-00577-CV-ACC-DAB

TERRELL M. JOHNSON,

Petitioner-Appellant,

versus

SECRETARY, DOC,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 14, 2011)

Before CARNES, HULL, and WILSON, Circuit Judges.

CARNES, Circuit Judge:

Earlier this year the Supreme Court reminded lower federal courts that when the state courts have denied an ineffective assistance of counsel claim on the merits, the standard a petitioner must meet to obtain federal habeas relief was intended to be, and is, a difficult one. Harrington v. Richter, ___ U.S. ___, 131 S.Ct. 770, 786 (2011). The standard is not whether an error was committed, but whether the state court decision is contrary to or an unreasonable application of federal law that has been clearly established by decisions of the Supreme Court. 28 U.S.C. § 2254(d)(1). As the Supreme Court explained, error alone is not enough, because "[f]or purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law." Harrington, ___ U.S. at ___, 131 S.Ct. at 785 (quotation marks omitted). And "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id., 131 S.Ct. at 786.

When faced with an ineffective assistance of counsel claim that was denied on the merits by the state courts, a federal habeas court "must determine what arguments or theories supported or, [if none were stated], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id., 131 S.Ct. at 786. So long

as fairminded jurists could disagree about whether the state court's denial of the claim was inconsistent with an earlier Supreme Court decision, federal habeas relief must be denied. Id., 131 S.Ct. at 786. Stated the other way, only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents" may relief be granted. Id., 131 S.Ct. at 786.

Even without the deference due under § 2254, the Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984), standard for judging the performance of counsel "is a most deferential one." Harrington, ___ U.S. at ___, 131 S.Ct. at 788. When combined with the extra layer of deference that § 2254 provides, the result is double deference and the question becomes whether "there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id., 131 S.Ct. at 788. Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding. This is one of those rare cases.

## I.

Terrell Johnson, who is sixty-five years old, has been on death row for nearly half of his life. He shot and killed a bartender and a customer at a tavern in

3

Florida in 1979, and the next year he was convicted for first-degree murder of the bartender and second-degree murder of the customer. By a vote of 7 to 5, a Florida jury recommended a death sentence on the first-degree murder conviction, and the trial judge sentenced Johnson to death.

It took Johnson's case a quarter of a century to make it through all of his state court appeals and post-conviction proceedings. See Johnson v. State, 442 So. 2d 193 (Fla. 1983) (Johnson I) (direct appeal); Florida v. Johnson, 9th Judicial Circuit, No. CR 80-101 (June 12, 1989) (Order on Motion for Post Conviction Relief) (Johnson II); Johnson v. State, 593 So. 2d 206 (Fla. 1992) (Johnson III); Johnson v. Singletary, 695 So. 2d 263 (Fla. 1996) (Johnson IV); Johnson v. State, 804 So. 2d 1218 (Fla. 2001) (Johnson V); Johnson v. State, 904 So. 2d 400 (Fla. 2005) (Johnson VI). In 2006 Johnson filed in federal district court a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The district court denied that petition three years later. Johnson v. Sec'y, Dep't of Corr., No. 06-577 (M.D. Fla. Aug. 26, 2009).

Johnson appealed, and this Court granted a certificate of appealability on two issues: (1) Whether Johnson was denied effective assistance of counsel in the investigation and presentation of mitigating circumstances at the sentence stage; and (2) whether he was denied a constitutional or statutory right to the

4

independent assistance of a mental health expert to testify about mitigating circumstances at the sentence stage.

## II.

### A. The Arrest

On January 5, 1980, Johnson was arrested in Oregon after he committed a robbery and attempted murder in that state. A pistol that he had in his possession linked him to the killings of the two men in Florida, James Dodson and Charles Himes. Three days after his arrest for the Oregon crimes, and while still in custody there, Johnson signed a written confession admitting that he had killed Dodson and Himes, and he was extradited to Florida to face charges there. On May 23, 1980, Johnson was indicted on two counts of first degree murder for the deaths of Dodson and Himes, and four days later the Florida trial court appointed attorney Gerald Jones to represent him.

### B. The Guilt Stage

As expected, the guilt stage of Johnson's trial for the two murders did not take long. It began on Tuesday morning, September 23, 1980. Over a period of two days the State presented sixteen witnesses. The defense called none. As the Florida Supreme Court found, the State proved the following:

5

On December 4, 1979, Terrell Johnson went to Lola's Tavern in Orange County to redeem a pistol he had pawned to James Dodson, the bartender/owner of the tavern. Although Dodson had given Johnson fifty dollars when the gun was pawned, he demanded one hundred dollars to return it. Before paying for the gun, Johnson asked to be allowed to test fire it and took the gun to an open field across the road from the bar where he fired several shots. While returning to the bar, Johnson, irate at what he considered to be Dodson's unreasonable demand, decided to rob the tavern. Johnson told police that he took Dodson and a customer, Charles Himes, into the men's room at the end of the bar, intending to tie them up with electrical cord. The customer lunged at Johnson and he began firing wildly, shooting both men. He then returned to the bar and cleaned out the cash drawer, also taking Dodson's gun, which was kept under the bar. As he was wiping the bar surfaces to remove fingerprints, Johnson heard movement from the back room and returned to find the customer still alive. Johnson shot him again, not, according to Johnson, "to see him dead," but to "stop his suffering."

Johnson I, 442 So. 2d at 194–95.

On Friday, September 26 at 10:50 p.m, which was after two days of jury selection and two days of trial, the jury returned a verdict finding Johnson guilty of the first degree murder of Dodson and of the second degree murder of Himes. Id. After the jury verdict, Jones requested more time to prepare for the sentence hearing but the trial judge set it to begin at 10:00 a.m. on Monday morning, September 29, just two-and-a-half days later.

## C. The Sentence Stage

At the beginning of the sentence hearing the jury learned for the first time about Johnson's criminal record. The parties stipulated that: Johnson was convicted of attempted robbery in 1968; he was on parole for burglary at the time he killed Dodson and Himes; and one month after those two murders he committed armed robbery and attempted murder in Oregon. Other than those stipulations and supporting documents, the State presented no additional evidence in the sentence stage. The defense presented four witnesses: Arthur Johnson, who is Johnson's father; Nancy Porter, who is Johnson's friend; Dr. Katherine de Blij, who is a psychologist; and Johnson himself.

Johnson's father, who was unemployed and disabled, was the first witness to testify for the defense. He told the jury that Johnson was born in Kentucky in 1946 and has a twin sister, an older brother, and also had a younger brother who had died. Some time after Johnson was born, the family moved to Indiana "for employment purposes." While they were in Indiana Johnson and his siblings were put in an orphanage for three months while their parents were separated. Five years later, when Johnson was about 12, his father moved to Florida, again for employment purposes. Instead of bringing his children with him, Johnson's father sent them to live with his parents (Johnson's grandparents) for six months

"because [he] didn't have a lot of money." Jones did not ask Johnson's father to tell the jury if his parents (Johnson's grandparents) had abused Johnson. After their time with the grandparents, Johnson and his siblings were taken to Florida, where their father was employed as a carpenter.

Jones did ask Johnson's father if he had a drinking problem, and he answered: "I didn't think so at the time but—weekend drinking. During the week, no. Just on the weekends." And when asked whether his wife would "also drink," he said "yes." Jones did not ask Johnson's father to give any details about his wife's drinking or whether she was an alcoholic. Johnson's father did say that he was home on the weekends, except for "[m]aybe fishing on Saturday" and "occasionally [he and his wife would] go dancing or something." Jones did not ask Johnson's father about any physical or emotional abuse he inflicted on Johnson, on Johnson's mother, or on any of Johnson's siblings. Nor did Jones ask Johnson's father if Johnson's mother physically or emotionally abused Johnson or any of his siblings.

Jones did ask Johnson's father about Johnson's criminal record. He said Johnson began getting into trouble when he was about 14 years old—"something like" breaking and entering. After the father testified that Johnson's drinking problem began when he was 16 or 17, Jones asked him if Johnson had ever been

8

sent to jail. He answered that Johnson and one of his friends once ran away to Georgia, and while there Johnson was arrested and jailed for breaking into someone's home. He also said that on a different occasion Johnson was jailed in Florida for another breaking and entering incident. Johnson's father testified that until the year before the trial, Johnson had never "gotten in any trouble for hurting people."

Johnson's father recounted that his youngest son, Sandy, had died in Vietnam in 1970. Then just eight months later Johnson's mother had died. Jones did not ask him how Johnson's younger brother or mother had died. After their deaths Johnson seemed to drink more, according to his father. He also explained that the difference between Johnson when he is sober and drunk is "like between daylight and dark." When Johnson is sober he is "well mannered," but when "he gets a few drinks he's, he's, has a tendency to lose his temper."

The jury then heard brief testimony from Nancy Porter who had known Johnson and his family for a long time. She testified that she was "[n]ot really close" with him, but also testified that the two of them were "just about living together" for the nine months before the murders.[1] She said that when Johnson is

---

[1] Porter had been called by the State as a witness during the guilt stage of the trial. Although she was not implicated in the murders, she was with Johnson the day before the murders and she was also with him the day after the murders when Johnson sold the gun that he

sober he is "a real gentle person" who will go out of his way to help people, but when he is drinking, he "has a complete personality change" and acts "like a totally different person." In her opinion Johnson's father had a drinking problem, but she "didn't see him that much when he did drink." She said Johnson, like his father, would get "[e]asily irritated" when he drank. According to Porter, Johnson had sought treatment for his drinking problem from the Alcohol Rehabilitation Program at Memorial Hospital in Hollywood, Florida.

The jury next heard from Dr. de Blij, a clinical psychologist who worked in Memorial Hospital's Alcohol Rehabilitation Program, also known as the Share Program. Dr. de Blij explained that the Share Program provided three days of detoxification followed by three weeks of intensive inpatient alcohol education and rehabilitation. Johnson had voluntarily entered the program on November 1, 1979, less than five weeks before the murders, after admitting himself to the hospital emergency room for alcohol poisoning.

Dr. de Blij testified that she was involved with Johnson because she was responsible for evaluating clients and conducting two group therapy meetings a week. Her impression of Johnson was that "his primary problem is what is

---

had reclaimed from Dodson.

10

referred to as a character disorder" and that "alcoholism was secondary." She

explained that:

> [Johnson] has an impulsive personality. And this differs from the antisocial personality in some significant ways. While there is a history of antisocial behavior in [Johnson's] case there is much more anxiety and fear, and an excessive amount of guilt that had been present for a life long period of time. That is, as a child, [Johnson] was already burdened with the feelings that he was an evil or bad person, and carried around with him a tremendous degree of anxiety and fear . . . of losing himself. Of somehow vanishing. . . . [In the literal sense] of ceasing to be of however our beingness is.

Dr. de Blij said that despite his problems, Johnson was active in the treatment and

she believed he sincerely wanted to cure his problems. Despite that, she did not

think that the Share Program was very beneficial to Johnson because it was geared

to people whose alcoholism is primary instead of secondary.

Dr. de Blij went on to say that she did not believe that Johnson was an

aggressive, vicious, or vindictive person. It was her opinion that when Dodson

told Johnson it would cost $100 to get his gun back, Johnson felt like he had been

robbed and thought he was justified in getting the gun back. She believed that

Johnson would do much better in a structured environment like jail.

On cross examination Dr. de Blij testified that she did not believe that

Johnson is psychotic, and did believe that he is capable of appreciating the

11

criminality of his conduct, that he knows the difference between right and wrong, and that he does not appear to learn from reward and punishment.

On re-direct, Jones asked Dr. de Blij the basis for "your opinion . . . as to the underlying cause or reason for him suffering from [his] guilt, anxiety, frustration feelings?" She explained that:

> It's my opinion that this has its origins in early childhood; that [Johnson's] early years were very traumatic. He was placed in an orphanage when he was between the age of four and five, when his parents split up. After they were back together he was put into his grandparents' home where he felt abused. He got very inconsistent parenting, very inconsistent punishment, and even as a child felt that he had already been really a condemned person. That he was a bad and evil person. That he felt responsible for those things that had happened within his family. This is not typical for children to feel that responsibility.

The last witness during the sentence stage was Johnson himself. He told the jury that he had been born in Kentucky in 1946 and that his father's testimony about his early background was "pretty much" correct. He explained that when he was five years old, he lived in an orphanage for about a year. He had not liked that because "[t]hey split us kids up. Very seldom got to see my brothers and sisters." When he got older his mother told him that the children had been put there because of their father's drinking. He went back to living with his parents until he was about eleven, and at that point he lived with his grandparents for a

12

year or so.  Jones did not ask Johnson any questions about what he experienced living with his grandparents.  Later, Johnson's parents took his siblings and him to live in Florida.  He quit school in the ninth grade and began drinking and working with his neighbor who was a plastering contractor.  He said that he would either get someone older to buy alcohol for him or he would steal it from the store.

Jones then had Johnson tell about the first time he was sent to jail.  When he was sixteen, he and a friend had hitchhiked to Georgia, and one night they were arrested for breaking into a farmhouse to get some food.  After he had served a sentence of about a year, his parents picked him up and brought him back to Florida.  Later, he was convicted of a separate incident of breaking and entering and was sentenced to two years imprisonment for it.

When asked whether he would describe his childhood as a happy one, Johnson said "[w]ell, the most of the time it was, until my mother started drinking."  His father was drinking before that time, but it was tougher when his mother started "because she was always the foundation" of the family.  When asked the extent of his father's drinking, Johnson answered that when he had his tonsils removed he had to stay at the hospital for three days because they did not know where his father was.  He later learned that his father had been away "drinking."  Jones did not ask Johnson if he had been abused by his father, or if he

13

had been abused by his mother, or if he had been abused by his grandparents, or if he had been abused by anyone else. He did not broach the subject.

Johnson also told the jury that the deaths of his younger brother and mother were very hard on him. Johnson had joined the Armed Forces in December 1968 and was dishonorably discharged in July 1970.] He told the jury: "I felt—I blame myself for both of them. My brother wouldn't have [had] to go to Nam if I hadn't went AWOL. I had orders to go to Nam before I went AWOL. My mother may not have died if I had stayed with her." Jones did not ask Johnson how his brother and mother had died.

On cross examination the State got Johnson to clarify that the two arrests and imprisonments that he had described were in addition to those that had been stipulated. The State then asked him if he disagreed with his father's testimony. Johnson answered, "[w]ell, about the times I was in the orphanage and at my grandparents'. It was longer than two or three months."

The parties then presented their closing arguments. In his argument the prosecutor explained that the jury was to consider various aggravating and mitigating circumstances. He walked the jury through all the potential statutory mitigating circumstances, arguing that none of them applied. He asserted that, despite Johnson's alcoholism, he was not "under the influence of extreme mental

14

or emotional disturbance," emphasizing Dr. de Blij's admission that Johnson knew, but disregarded, the difference between right and wrong. The prosecutor admitted that "I just can't dismiss" the possibility of emotional and mental disturbance, but posed to the jury the following rhetorical question: "Wouldn't you be surprised if you didn't see any problem whatsoever in a person who would commit the kind of act that we discussed last week?"

As for Johnson's capacity to understand criminality and conform his conduct to the law, the prosecutor stressed Dr. de Blij's opinion that Johnson was in fact capable of appreciating the criminality of his conduct. Not only that, he argued, but Johnson's guilty mind was apparent from the fact that he wiped down the bar for fingerprints after he shot Dodson and Himes. Johnson was, the prosecutor argued, "perfectly capable of conforming his actions to the law," which is what he does "98% of the time." Johnson, he reminded the jury, "drove up here under his own head of steam on December 4th and robbed and murdered, and he drove back under his own head of steam."

Addressing whether there are "any other mitigating factors," the prosecutor argued:

> [Johnson's] father had a drinking problem. Okay, weigh it. [Johnson] had problems with his parents. Who hasn't? [Johnson] changes when he drinks. Who doesn't? . . . Ladies and gentleman, Terrell Johnson

15

sought to put himself on the stand, paint himself as a lonely problem ridden victim of an early and traumatic childhood. Is that true? Nancy Porter cares about him. His father loves him. A doctor cares enough about Terrell Johnson to come up here and testify in his behalf. A woman cares enough about him to marry him. Is he all that lonely and isolated? Is that the root of his problem? Does that cause his murder? Does that cause his robbery? I submit to you that it does not. Because it just ain't so.

After saying that the mitigating circumstances were an "unhappy childhood, [a] drinking problem, [and that he] reacts when he's threatened," the prosecutor summarized the statutory aggravating circumstances. He argued:

[Johnson has a] long term pattern of violence. He does this kind of act for $100.00 and a cheap gun. He does it so he can get rid of witnesses and never be called to task in a bar of justice. He does it in a heinous and atrocious and cruel manner. He does it coldly and calculatedly and premeditatedly. And he doesn't have a shred of legal or moral justification. Weigh them, ladies and gentlemen.

Jones then presented his closing arguments on behalf of Johnson. He started off by telling the jury that it had a tough decision to make: deciding whether Johnson should be sentenced to death or "life with no parole for 25 years." He explained that with a life sentence Johnson would be in prison for "a long, long, long time" and could not be considered for parole until he is 59 years old. He admitted that the prosecutor had explained the law "in an adequate manner," but argued that this was not a case that justified a death sentence. Jones summarized the background evidence that he had presented and its relevance:

16

Look at Terrell Johnson. Look at his background. I didn't bring this up about the orphanage to evoke an emotional response to make you say, oh my gosh, that poor little boy. I didn't do that. Not at all. I thought it important for your purposes in determining what kind of person Terrell Johnson is, what kind of adult he has evolved into; that you see some of his background. He was in an orphanage for a while. He lived with grandparents for a while. He lived in a home where one or both parents had a drinking problem. He had little supervision during his formative years.

* * *

There was testimony that [Johnson] lost both his brother and his mother around '70, 1971. Once again, that was not presented to you for purposes of this poor boy type of reaction. It was given to you to show that he has had for a number of time problems that you or I could perhaps go on and live our [lives]; that it would [a]ffect you but not that substantially. But due to his inability to cope, due to his guilt feelings, his feelings of inadequacy—excuse me, these matters were extenuated, magnified many times.

Jones told the jury that he had called as witnesses Johnson's friends and family to show that "[Johnson] is capable of liking people, of getting along with people . . . [but] when he drinks that this helpless feeling comes to the front and he reacts quickly and harshly."

Jones disagreed with the State's position that this was "a cold deliberate calculated type of killing." He insisted, instead, that: "This happened quick. This happened in a flurry that these two people were shot and killed." Jones said that this was not a "cold, heartless, deliberate, and indiscriminate" killing where "people are indiscriminately blown apart" or "somebody is paid X number of

17

dollars to shoot someone." He also disagreed with the State's contention that the crime was cruel, heinous, or atrocious, taking the position that Johnson's actions were not "unnecessarily torturous to the victim." Jones then argued that Johnson was under extreme mental or emotional disturbance because, according to Dr. de Blij, he could not cope and conform his actions to the law. He also referred to Johnson's father's and Nancy Porter's testimony that although Johnson could be personable, warm, and loving, "when he drinks . . . this helpless feeling comes to the front and he reacts quickly and harshly." And, he said, Johnson was "not able to cope" with those feelings "[i]f he's criticized, if he's upset."

Jones argued that when conditions are normal and "there's no threat, no problem," Johnson is "not the type of person" who would "deliberately shoot someone." When the patron "lunge[d] for him," however, Johnson "panicked and he started firing." He reacted that way, Jones argued, because "he was under the influence of extreme mental or emotional disturbance" and his "capacity . . . to appreciate [the] criminality of his conduct or to conform his conduct to the requirements of law [was] substantially impaired." Focusing the jury's attention on the time of the shootings, Jones asked, "How was he able to cope? How was he able to conform?" Answering his own question, Jones said, "Not very well according to the testimony of Dr. de Blij." Jones then concluded by "submit[ing]

18

to you that a life in prison with no consideration for parole for at least 25 years is adequate punishment considering the totality of the circumstances."

After deliberating for close to four hours, the jury returned a verdict recommending, by a vote of 7 to 5, that Johnson be sentenced to death. The court then found the following aggravating circumstances: the crime was committed while Johnson was under a sentence of imprisonment; Johnson had been convicted of prior felonies involving the use or threat of violence; the crime was committed during a robbery and for pecuniary gain; the crime was committed to avoid detection and lawful arrest; and the crime was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

As for the statutory mitigating circumstances, the court found that Johnson was not under the influence of extreme mental or emotional disturbance at the time of the murder, even though he was angry with the bar owner. Although it noted Johnson's impulsive personality and his alcohol abuse, the court found that "the evidence affirmatively showed that [Johnson] had capacity to appreciate the criminality of his conduct." The court went on to find, or at least observe, that:

> [O]ther evidence relating to the character of the Defendant was offered as mitigating circumstance: his traumatic childhood, his periodic separation from and neglect by his alcoholic parents; the somewhat recent loss of his mother and brother over which he had feelings of guilt and depression; his recognition of need of treatment; his completion of

19

a treatment program and return for aftercare; [and] his gentle considerate nature when not drinking or when he was not reacting to being put down by other persons. It then concluded:

The Court after weighing the aggravating and mitigating circumstances finds that the sufficient aggravating circumstances exist which outweigh the matters offered as mitigating circumstances. And that under the evidence and the law of this state a sentence of death is mandated.

On direct appeal, the Florida Supreme Court affirmed the death sentence, upholding the trial court's findings concerning aggravating and mitigating circumstances. Johnson I, 442 So. 2d at 197. As to the aggravating circumstances, it repeated that:

[T]he homicide was committed in a cold, calculated and premeditated manner[;]that the homicide was committed to avoid lawful arrest[;] the homicide was committed during a robbery and for pecuniary gain[;] . . . [t]he defendant was under sentence for another crime at the time the murder was committed; Johnson was on parole at the time[;] [and] [t]he defendant had previously been convicted of felonies involving the use or threat of violence.

Id.

III.

After the Florida Supreme Court affirmed Johnson's conviction and sentence, he filed a Rule 3.850 motion for post-conviction relief raising fourteen claims. On December 22, 1986, the state collateral court held an evidentiary

20

hearing on some of those claims, including the claim of ineffective assistance of counsel regarding the investigation and presentation of mitigating circumstances evidence.[2] On the issue of non-statutory mitigating circumstances, six witnesses testified at the hearing, and Johnson filed the affidavits of four witnesses.[3]

## A. Gerald Jones

Attorney Jones' testimony at the 3.850 evidentiary hearing centered on his preparation before and during trial and why he followed the strategies that he did. At the time of his appointment Jones was busy at the public defender's office, where he was supervising two divisions of attorneys. Two inexperienced attorneys had just joined one of those divisions, and in addition to Johnson, Jones had 60 other clients who were facing felony charges.

Jones explained his trial strategy. At the time of the trial he was familiar with the law of voluntary intoxication. He said, "I recall I did some reading on

---

[2] At the evidentiary hearing four witnesses testified for Johnson about two statutory mitigating circumstances: lack of substantial capacity, and extreme mental and emotional disturbance. Those four witnesses were Dr. de Blij, Dr. Elizabeth McMahon, Dr. Daniel Glennon, and John Cassady. We will not describe their testimony because we are convinced that Johnson is due habeas relief on his ineffective assistance of counsel claim insofar as it involves the investigation and presentation of non-statutory mitigating circumstances, and for that reason there is no need for us to decide whether Johnson was deprived of effective assistance in the investigation and presentation of statutory mitigating circumstances.

[3] There was one overlap of the affiants and the testifying witnesses. Johnson's aunt, Mildred Hefner, was one of the six witnesses and she also signed a joint affidavit with her husband, H.W. Hefner.

21

that at the time since it seemed to be the only possible defense." Jones did not remember if he read any cases that would have indicated that Johnson was entitled to an instruction about that defense; in any event, Jones decided not to pursue that defense.[4] He explained:

> In his confessions the only time he indicated that he was intoxicated was, I think, in the confession he said he was a little drunk. So in order to establish a predicate to lay the foundation for intoxication defense, I would have to use Mr. Johnson as a witness.
>
> And in my conversations with him, I decided that would be a very poor move. Number one, he had several convictions. Number two, in his telling of the incident he was very cold, very dispassionate, showed no emotion whatsoever. . . . The way he related the incident, and not so much that, but the fact that in his confessions he was able to remember with such great detail and particularity what had occurred from the time he arrived at the bar until he left. And I thought that a jury would not be convinced that someone who was so intoxicated could be able to remember in such detail what had occurred.
>
> Not only that, but part of his confession was that as he sat there with the gun in front of him talking to the bar owner and the patron of the bar he formed the intent to rob the place, which would seem to belie not being able to form an intent, which is what you would be trying to convince a jury of with an intoxication defense.
>
> So for those reasons I elected not to attempt an intoxication defense.

---

[4]When the trial took place, Jones "knew [alcoholism] was an addiction" but did not know it is a disease. Had he known it was a disease back then, he "would have had persons who were experts in the field of alcoholism testify at the mitigation portion of the trial, the advisory portion of the trial, regarding the effects of long-term alcoholism and how it can impair someone's judgment."

22

Given the evidence against Johnson, including his confession and the fact that he was caught with victim Dodson's gun, the "only real defense [Jones] could see was that there was no premeditated design to effect the death of either one of these fellows." The serious problem with that defense, Jones acknowledged, was that Johnson had already confessed to facts that constituted felony murder, which carries a presumption of premeditation. Jones admitted that he had "no defense to felony-murder in the case." This exchange occurred during Jones' testimony:

Q:     It sounds like, as far as you're concerned, you had no defense to felony-murder in the case; is that correct?

A:     That's correct.

Q:     Or you presented none?

A:     That's correct.

Q:     You hoped the jury would believe that premeditation was what was important; is that correct?

A:     That's correct.

Q:     You did realize that the jury was instructed by the Judge and would be instructed by the Judge that it wasn't; that felony-murder could do it?

A:     Yes, sir.

23

The point of those questions, of course, was that Jones knew well before the guilt stage began that he had little or no chance of prevailing at that stage, and that it was highly likely that there would be a capital sentence hearing at which his client's fate would be determined.[5]

Before the trial began, Jones reviewed a number of reports about psychological evaluations of Johnson, but none of them had been conducted for these charges and this trial. Jones testified that one of the reports was from Memorial Hospital in Miami and three others were from the "Miami/Fort Lauderdale/West Palm Beach area." All four of them "were psychological reports . . . primarily related to his drinking." Jones also reviewed a report from the psychiatrist in Oregon who had evaluated Johnson after his arrest there for robbery and attempted murder.[6] According to Jones, "none of [the reports] were very

_____

[5]Jones was partially successful in the sense that the jury returned a verdict of second degree murder on the charge stemming from the killing of Himes, although its verdict of first degree murder for the killing of Dodson made Johnson as eligible for a death sentence as if there had been two first degree murder convictions.

[6]In Oregon the officers had a psychiatrist interview Johnson before he was interrogated by the police. Jones understood that was common practice there:

Q:      Did you talk to them whether it was standard practice to send a psychiatrist in before they interviewed somebody?

A:      Yes, sir. They said it was in major crimes; that they immediately made available a psychiatrist. And they had some fellow that, evidently, interviewed all of these people for them.

24

favorable. Some of of [sic] which were very unfavorable." In any event, Jones "didn't have any doubts" that Johnson was competent to stand trial and he was sure that Johnson was sane.

Jones still wanted to get a "personality profile" of his client. A week before trial he filed a motion requesting that John Cassady, a jail psychologist he had dealings with in the past, perform a "battery of psychological tests" on Johnson. Jones did not say why he waited until a week before trial to make the request, but he did testify that "the purpose of [this] testing . . . was simply to get a personality profile." Jones admitted that he did not talk with Johnson's family, or any family physicians, or any schoolteachers, or get any school records, in order to provide Cassady with background information about Johnson. Although Jones "did talk to a former employer," he does not think he gave any of that information to Cassady. Jones explained: "[t]his was not a psychiatrist. I wanted a personality profile, and I really wasn't certain what part a background investigation would play in profiling someone."

Cassady performed two tests on Johnson, the Minnesota Multiphasic Personality Inventory and the California Psychological Inventory. Cassady found that Johnson: "has an emotionally unstable personality along with a conduct or behavior disorder. Currently he is competent to stand trial. I have also concluded

25

that he was sane at the time of the alleged offense and was able to appreciate the nature and consequences of his acts." Jones did not remember talking to Cassady after he performed the tests, but he was "sure [he] did." Jones acknowledged that Cassady's report, which he had thought would be confidential, was also sent to the State prosecutor and the judge. That was a recurring problem that he had experienced with mental health professionals.

Jones also contacted a couple of physicians other than Dr. de Blij, but he learned that "they were only involved in evaluating [Johnson] as part of admitting him to an alcohol treatment program or something in that regard," so "evidently she had more contact than anyone else," which is why he used her as a witness. And when he talked to Dr. de Blij, "She said she didn't really have that much contact with [Johnson]; that she had met him a couple times in group therapy, and that she didn't think she would be very much help." That was the only substantive conversation that Jones had with Dr. de Blij before the trial began. He first met with her in person the morning that she testified during the sentence hearing. This is Jones' testimony about that meeting with Dr. de Blij the morning of the sentence hearing:

Q:     And do you recall talking to her before the penalty phase hearing?

A:     Yes, sir. We met in my office that morning, and I talked with her.

26

Q:     What do you recall talking with her about or saying to her?

A:     I explained to her what was going on. That this was an advisory phase of the proceeding. And that there were certain aggravating circumstances and certain mitigating circumstances the Court could consider. And I told her I had called her up for whichever circumstances there were. And I think it was the ability of the defendant to appreciate the nature of his acts was diminished, or a severe emotional stress, or something along those lines.

Q:     Do you recall discussing that with her before you came over to the penalty phase hearing?

A:     I don't recall the specific—specifically saying, "This is exactly what I want you for." But I would have. I mean, knowing the way that I operate, I would have told her why she was here and what I was seeking. But I can't recall specifically doing that.

Q:     And for what purpose did you call her to the stand, to the best of your recollection? What was your strategy or your attempt to convey to the jury?

A:     Point out that during this time period Mr. Johnson was going through a bad period in his life regarding alcoholism and for her to give her impressions of him and his personality and how he would react in this situation, and whether he could cope with the situation such as this.

"From the outset" of his representation, Jones had talked with Johnson himself to get "some background from him and finding out what persons I should contact and what he expected them to say." Jones did not talk with anyone else before the trial began in order to learn about Johnson's background in preparation for the sentence stage. He did telephone or send letters to Dr. de Blij, to a

27

"friend/employer" of Johnson's who he thinks is named "McClanahan," and to Johnson's relatives "several weeks" before trial began. However, he was not trying to do any background investigation on Johnson; instead, according to Jones, "the purpose of the contact was to tell them when and where" the trial would be held. Jones went on to say that "if I saw [any members of Johnson's family] at all before [sentencing began] it would have been say, a Friday, [the day the guilt stage ended]."

The judge presiding over the evidentiary hearing in the state collateral proceeding sought to clarify what contact Jones had with Johnson's family members and whether it was before the guilt stage or before the sentence stage:

THE COURT:     Do you remember what relatives you may have talked to in regards to his case?

THE WITNESS:   I remember his father in particular. And there was a girl friend. You're talking about prior to the trial beginning?

THE COURT:     Yes.

THE WITNESS:   It seems like I told Terry—Terry was writing them or something—to tell them to make plans to be here. Really, six years ago, it's hard for me to remember.

THE COURT:     What about at trial, do you recall talking to any of those parties?

28

THE WITNESS:    Yes, sir.  I recall a whole, several people on a bench.  And we were in this courtroom.  Several people on a bench outside and talking to them then.  I have a vague recollection of coming back to one of the rooms and talking to them.  But whether that's accurate, honestly, I can't say.

But I remember after talking to them—I tried talking to them collectively and then one at a time.  One girl was crying or about to cry and said that she just couldn't testify; that she was too upset.  I think it was a girl friend or former wife of Mr. Johnson's.[7]  I explained that to Mr. Johnson, and he said he understood, that she would get too upset to testify.

I remember upon talking with the father that I was a bit—

MR. OLIVE:      Is this a narrative . . . ?

* * *

THE COURT:      You may proceed as to what people you talked to before trial and what your perceptions were.

THE WITNESS:    Before the father testified, I was talking to him and asking him some questions based on what Mr. Johnson had told me.  And the father related that the home life wasn't nearly as bad as Mr. Johnson had indicated.  And I was a little disappointed at that.  And that's about the extent of it.

---

[7] Johnson's ex-wife, Deborah Beasley, swore in an unrefuted affidavit that she never spoke with Jones, so we assume that she was not the woman who spoke with him on a bench outside the courtroom.  On the other hand, Pat Sweeney, Johnson's girlfriend whom he had apparently married after being arrested in Oregon, never denied speaking with Jones.  For that reason, the woman Jones spoke with on the bench that day probably was Sweeney.

Johnson's counsel then continued this line of questioning:

MR. OLIVE:     Did you expect Mr. Johnson to just suddenly tell you he was an alcoholic who had deserted his son and to jump up on the stand?

* * *

A:     Well, I remember discussing with him, telling him Terry, the son, was on trial for his life, basically, and that he had said that he, the father, was an alcoholic and was somewhat abusive and would leave the family. And I remember the father shaking his head and saying, "No, no, that wasn't right at all."

Q:     This is after he had been convicted and when you were getting ready for sentencing?

A:     Right.

Q:     So you specifically remember that?

A:     Yes, I have a recollection of that.

Q:     So if he says he got on the stand before you ever talked to him, he is mistaken?

A:     He's sadly mistaken.

Q:     One of you is mistaken?

A:     I would never do that; call someone, and never talk to them before.

Q:     I don't know whether you would, or not. With regard to intoxication and also the other person that

30

you spoke with, talked to a girl friend. Is it your professional opinion that someone who took the stand and was shook up or concerned or crying would be a bad witness at a sentencing hearing?

A:     Well, it was my opinion that she refused. She said, "I can't do it; I won't do it," and I sat down and I talked with Mr. Johnson, Terry, and I told him the situation. I said she might have some good things to say in front of the Jury, but she says she's physically unable to do so. And he excused her. He said, "I don't want her to do it then."

Q:     This was at the same time after conviction, pre-sentencing hearing?

A:     Yes, sir.

According to Jones, that's all he did to prepare for the sentence stage. What he readily could have done but did not do was shown through the affidavits and testimony of a number of witnesses at the evidentiary hearing.

B. Charles Johnson

Charles Johnson, Johnson's older brother, signed an affidavit that detailed some of the disturbing aspects of their childhood. He attested that they were "forced to live in a very frightening and violent environment" where their parents would have "literally knock-down, drag-out fights." Their father would come home drunk, "start beating [their] mother," and they would have to "hide in the bedroom because if we didn't we would be knocked around too." He said that

31

their mother, like their father, abused Johnson.  She "used to single [Johnson] out," and although she beat all the children, she saved "her knuckles" for Johnson and beat him the worst.

Charles Johnson also explained that when they were forced to live with their grandparents, "[t]he abuse my brothers and I had to live through was horrible . . . pure hell."  There were fifteen people living in their grandparents' house and four of them—Johnson, his older brother, his younger brother, and one of their cousins—all had to sleep in one small bed.  In addition to the physical abuse, the emotional abuse they endured "hurt just [as] bad as any beating."  And when the children returned to live with their parents, they continued to "suffer[] a great deal."  He explained that their parents' "drinking and fighting continued but had gotten worse," and that on many occasions he would have to call the police to stop it.

Charles Johnson also detailed some of the mental abuse that Johnson endured.  He recounted the first "of many times" that Johnson witnessed his mother attempt suicide.  When Johnson was 12 or 13, their parents came home from one of their typical nights of drinking.  They began fighting and their father "shut her up" by hitting her.  After 3 a.m. Johnson found his mother trying to kill herself by lying in bed with a plastic bag over her head.  According to Charles

Johnson, it was around that time that Johnson "couldn't cope with what was going on at home anymore." That was when Johnson "began drinking and doing drugs . . . and things got progressively worse."

Charles Johnson also explained that their younger brother Sandy had died in Vietnam not in combat but, according to the Army, from a drug overdose. This "had a major impact" on Johnson, who "blamed himself for Sandy's death." And when their mother finally succeeded in killing herself, "by taking an overdose of drugs and alcohol," that also had a "devastating impact" on Johnson.

Charles Johnson was not contacted by Jones, but attested that "[h]ad I been contacted by [Jones], and asked to testify to the things I have said . . . I would have done so."

### C. Geraldine Keaton

Geraldine Keaton, Johnson's twin sister, signed an affidavit describing how their childhood was in "a constant state of turmoil, because of the instability of our parents due to alcoholism." She told how their father would come home and beat their mother, who would fight back. It got so bad that their mother even attacked their father with a butcher knife. Their fights would force Charles Johnson "to run next door to our neighbors and call the police" while the other children "huddled

33

together in terror." According to her, "[t]his was not a rare thing—it was a way of life."

Keaton said that "[t]he amount of emotional abuse we had to endure when we were growing up is almost indescribable, unless you have suffered through it." She explained that Johnson was abused by not just their parents but also by their grandparents. She recounted how Johnson had a bed-wetting problem as a young child and as punishment the grandparents would rub his face in his own urine. She also told the story about a "family" Christmas she would never forget when their father "came home drunk and on a rampage," tore down the Christmas tree, began fighting with their mother, and Johnson's older brother had to call the police because their mother "pretended" to commit suicide by taking an overdose of tranquillizers. During another of the "several times" that their mother attempted to commit suicide, she "slit her wrists." Keaton reported that the physical and emotional abuse they endured had caused her to "beat and abuse [her] baby boy"—just as their parents had done to them.

Johnson's sister—like Johnson's older brother—said: "I was never contacted by Terrell's lawyer before or after his trial. Had his attorney talked to me I would have told him what I have said in this affidavit."

D. Mildred Hefner and H.W. Hefner

34

Mildred Hefner and H.W. Hefner, Johnson's aunt and uncle on his father's side, discussed in a joint affidavit the "abuse that [Johnson] lived through as a child." They stated in their affidavit their belief "that the unstable environment and abuse that Terrell lived through as a child has had a major negative impact on Terrell's life." They explained that:

> As a child [Johnson] was quite shy, but always polite. Unfortunately, [he] was treated very badly as a young child. He was abused and whipped severely by his mother . . . who was an alcoholic. Many times she used a leather strap when beating [him]."
>
> [His mother] was also verbally abusive to [him]. She would yell and curse at him. She seemed to single him out, and treated him very differently than his brothers and [sister].

They explained that the reason Johnson was sent to live in an orphanage and with his grandparents was that "his father Arthur Johnson abandoned [him] and the family." And when they visited Johnson's family after the kids returned from living with the grandparents, "we found Terrell to be very withdrawn and quiet . . . [however] [h]is mother still continued abusing [him] the way she had abused him before." They also stated that they "rarely saw [Johnson's mother] without a beer or drink in her hand."

In addition to signing the affidavit, Mildred Hefner testified in person at the evidentiary hearing and gave a number of examples to support her belief that

35

Johnson's mother and father were alcoholics. After being presented with a lot of testimony on the subject, the judge presiding over the evidentiary hearing interrupted it to say:

THE COURT: Let me interrupt here. Does the State have any other contention but that both parents were alcoholics?

MR. LERNER: It appears to be the case, Your Honor.

THE COURT: I don't know that we need to explore this issue.

\* \* \*

MR. OLIVE: Judge, there's a real dynamic here that's a real problem, and that is it's sort of cumulative to present this to the Court, but I can't say it would be cumulative to present this to the Jury at sentencing. . . .

THE COURT: Well, the rules of evidence provide that counsel does not make cumulative or repetitive presentations at trial. So I don't know why we should go through it at this point.

MR. OLIVE: Because the rules of evidence don't apply at sentencing proceedings, at least not rules that would prevent mitigation from being introduced.

THE COURT: We're not preventing mitigation. I'm saying you have presented your point, and the State is not going to be offering anything in refutation of that issue.

In their affidavit, the Hefners—like Johnson's older brother and his sister—said: "We were never contacted by anyone before Terrell's trial with regard to his case. Had his attorney talked with us we would have told him all we know about our nephew Terrell Johnson and would have been willing to testify in his behalf."

## E. Deborah Beasley

Deborah Beasley married Johnson in 1973 but divorced him two years later "[b]ecause of his drinking problem." She testified at the hearing about what she had learned of his background. She told how Johnson and his siblings would be left at home by themselves for days at a time while their parents were out drinking. She said that his father was always drinking, "no matter what day or whether it be morning or night." She told how in the orphanage, and even at his home, Johnson would have to find his own food to eat. She said Johnson used to cry about his family not loving him and how he felt responsible for his brother's death. She recounted:

> He would start to cry. He would just snap and start to cry and would think that his family didn't love him. He would cry a lot about his brother [who] was killed in the service. And about his mother [who] had committed suicide. And he felt that his family didn't love him. He

37

felt if he had of [sic] been in the service instead of his brother Sandy—he felt that it was his fault that Sandy got killed.

She also told how Johnson was the one who found his mother dead after she committed suicide; and when Johnson found his mother, who had died of an overdose just like his younger brother Sandy, in her dead hands was a photograph of Sandy. Whenever Johnson—who felt responsible for both deaths—talked about this "[h]e would fall apart."

Although Johnson "never even attempted" to hit Beasley, his drinking had doomed their marriage. She explained: "It just seemed like an endless road, that our marriage would never work. You know, I would leave, and he would say if I would come back he would never drink again. And then it would be the same thing over and over."

When the two were separated Johnson tried to commit suicide using alcohol and drugs. Beasley's friends had to break down his apartment door and, once they got him up from the living room floor, he began foaming at the mouth. At the emergency room Johnson's stomach was pumped, saving his life, but the incident led his family doctor to conclude that "he would never consider Terry a mentally stable person."

Beasley also testified about some of Johnson's good qualities. She said that he "was a very kind person" who "didn't say an unkind word" when he was sober. Johnson baby-sat her young nephew and "was very good with children." "He was a great husband to me, you know, when he wasn't drinking," she said. Johnson was willing "to help clean or mow the grass" and "would constantly look for a reason to buy flowers" or another gift. Beasley "never saw him do anything violent with anyone," even when he would "[j]ust go bananas" from drinking. She testified that she never "saw [Johnson] express anger, hostility, or violence toward another person because he was drinking."

Beasley also testified that Johnson's drinking "[q]uite often" caused him to black out, and she agreed that it was "typical" for him not to clearly remember events that took place while he was drinking. She added, however, that just because Johnson had a clear memory of certain events did not necessarily mean that he was sober or only mildly intoxicated when those events happened. Beasley—like Johnson's older brother, his sister, and the Hefners—was never contacted by Jones and would have been able and willing to testify had she been contacted.

F. Sheila Young

39

Sheila Young, Deborah Beasley's sister and Johnson's former sister-in-law, testified that "Terry is a very likable person" who was "very kind [and] very considerate" when he was sober. However, "when he was drinking, he would get very depressed . . . [and] sometimes he would cry." She explained that "[h]e would talk about his childhood, [the] death of his mother, the death of his brother, being in an orphanage home, things of that nature, about his childhood."

Young—like Johnson's older brother, his sister, the Hefners, and Beasley—was never contacted by Jones and would have been able and willing to testify had she been contacted.

## G. Mary McDaniel

Mary McDaniel, Johnson's former mother-in-law, testified that when Johnson was not drinking, he was pleasant, helpful, good with children, and "a real nice person." However, Johnson "was a complete[ly] different person" when he drank. And when he drank "sometimes [she] would see him cry and talk about things that happened when he was a child. . . . [He would talk about how as a child] times were bad; that they were left alone as little children and had to find their own food and prepare it and do their own laundry, and that they were in a home of some kind."

McDaniel—like Johnson's older brother, his sister, the Hefners, Beasley, and Young—said that she was never contacted by Jones but that she would have been willing to testify had she been contacted.

## H. Arthur Johnson

At the evidentiary hearing Johnson's father, Arthur Johnson, testified about his alcoholism, which began in the early 1940s, and he explained its impact on Johnson's home life. Despite his denials at the sentence hearing, he now admitted that he "would drink almost every day when [he] could afford it." Additionally, Johnson's mother and maternal grandfather were alcoholics. On weekends, the mother and father would leave the children home alone and go out and drink. After Johnson's younger brother died in Vietnam, the mother's drinking "got worse," and a year later she committed suicide. When asked why he did not admit during his testimony at the sentence hearing that he was an alcoholic, Arthur Johnson testified:

A: At that time I was more or less ashamed to—I didn't realize that it meant so much to say that I was an alcoholic. I was ashamed of it, actually, to admit to people that I was an alcoholic. I didn't believe it myself at the time, really.

Q: If you had been informed by counsel that your status, that the fact that you were an alcoholic was or could be important in the case, would you have testified regarding it?

41

A:     Yes, I would have.

Q:     Would you have admitted that you were an alcoholic?

A:     Yes, I would have.

Johnson's father blamed himself for Johnson's problems, explaining that "the responsibility for Terry's problems is more my fault than anybody else's fault, not being the decent father that I should have been." He also explained why Johnson had to be put in an orphanage:

Q:     . . . We have made an allegation in our pleadings that the home life, Terry's home life, was affected terribly by your treatment, your wife's treatment and because of your alcoholic condition.

       Could you address yourself to that and tell the Court your feelings and memories about whether that's true or false?

A:     That's true. When I worked for the State, I worked out of town most of this time, and I would be gone five days a week. I came home this one weekend. My wife and I had a squabble, a little argument. And I had to go to town and get my paycheck. So I went on a binge, and I didn't show up for three months.

Q:     Where did you go?

A:     I went to Detroit.

Q:     You deserted the family for three months; is that true?

A:     Yes, true.

Q:     Were you on a binge the whole time you were in Detroit?

42

A:     Yeah, every day.

*  *  *

A:     . . . I came back, and the children had been put into the [orphanage], in the State of Kentucky.

Johnson's father believed that he and his wife had kept food on the table, but that their drinking meant that Johnson "lacked a lot of supervision."  Johnson's father also testified that Johnson was a "good boy" who "never gave me any problems when he was growing up."  He had worked alongside Johnson in carpentry and said that he was efficient and hard working—"the best worker I ever did work with."

Johnson's father testified that Jones did not contact him until "days" before the sentence hearing.  He was asked over the telephone to be a "character witness," but Jones did not tell him any details about what that meant.  It was his recollection that Jones did not speak to him between his arrival at the sentence hearing and his testimony.  He further said that "[n]o one talked to me sitting in the hall before the trial."  Had Jones discussed these topics with him before that hearing, Johnson's father "would have told the same story I told today, certainly."

On cross-examination, the State challenged the assertion by Johnson's father that he would have discussed his alcoholism at the sentence hearing if Jones

43

had been more diligent.  Johnson's father stated that, at the time of the trial, he did

"[n]ot really" even think he was an alcoholic.[8]  He said that it was not until six

months before the Rule 3.850 hearing that he realized that he had a drinking

---

[8] The State elicited the following testimony:

> Q.    But at the time you didn't feel you had a drinking problem?
>
> A.    Not really.
>
> Q.    And didn't feel that you were an alcoholic?
>
> A.    Not really.
>
> Q.    Are you saying that if Mr. Jones had tried to establish that you were an alcoholic, that you would have lied and said it wasn't true, or you would have gotten up—
>
> A.    I don't think I lied, because I didn't think I was an alcoholic.
>
> Q.    And that's what you told the jury; is that correct?
>
> A.    To the best of my recollection.  But I know now that I was an alcoholic, and I have been since 19—1940.  I have been an alcoholic.
>
> * * *
>
> Q.    But that's what you realize now in looking back on the situation?
>
> A.    That's true.
>
> Q.    Six years ago when Mr. Jones had you on the stand, at that point you didn't feel that you were an alcoholic?  You didn't feel that you had a drinking problem?  And when he asked you that question that's what you told the jury; is that correct?
>
> A.    That's true.  [But] [i]f he would have gone into detail like this gentleman that is here today, I would have gone into detail like I have today.

44

problem. Johnson's father stated that he will still "have a beer occasionally." He thinks, however, that he "can handle [his] drinking problem at this point" and "take a friendly drink now and walk away from [the] bottle." On re-direct, Johnson's father explained that regardless of whether he would have used the term "alcoholic" to describe himself, if he had been "told that it was important to detail and tell the truth about how much [he] drank and how long [he] had been drinking," he would have testified about those details.

IV.

Johnson contends that his trial counsel's performance at the sentence stage was constitutionally ineffective, as measured under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984), because his counsel failed to reasonably investigate and present available mitigating evidence about his background and, if he had done so, the sentence would have been different.

Under Strickland Johnson must make two showings. First, he must show that his counsel's performance was deficient, which means that it "fell below an objective standard of reasonableness" and was "outside the wide range of professionally competent assistance." Id. at 688, 690, 104 S.Ct. at 2064, 2066; see also Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 751 (11th Cir. 2010); Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1349 (11th Cir. 2009). In deciding

45

whether there was deficient performance, courts must review counsel's actions in a "highly deferential" manner and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. To overcome Strickland's presumption of reasonableness, Johnson must show that "no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

The second showing required under Strickland is prejudice: the petitioner must also show that, but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different—that is, our confidence in the outcome must be undermined by counsel's deficient performance. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.

"When examining a district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error." Williams v. Allen, 542 F.3d 1326, 1336 (11th Cir. 2008) (quoting Grossman v. McDonough, 466 F.3d 1325, 1335 (11th Cir. 2006)). "An ineffective assistance of counsel claim is a mixed question of law and fact subject to de novo review." Id. (quoting McNair v. Campbell, 416 F.3d 1291, 1297 (11th Cir. 2005)).

46

Johnson's claims are governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. See 28 U.S.C. § 2254(d). A federal court may not grant a petitioner habeas relief on any claim that was "adjudicated on the merits" in state court unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see also Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d at 745; Hammond v. Hall, 586 F.3d 1289, 1306 (11th Cir. 2009). This is another layer of deference that is added to the one that already exists under Strickland to protect the performance of trial counsel from overly intrusive scrutiny. Harrington, 131 S.Ct. at 788. The double layer of deference means that the issue is whether "there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

After the evidentiary hearing, the state collateral court decided that Johnson's trial counsel was not deficient in investigating and presenting mitigating circumstances. Johnson II, No. CR 80-101 at 3–4. The court stated that "trial counsel did conduct a reasonable investigation into the Defendant's background" because counsel "had enough information available to him to make

47

informed strategic decisions" on both the statutory and non-statutory mitigating circumstances. Id. at 2–3. The court described as "without merit" Johnson's argument that trial counsel had erred in not presenting further non-statutory mitigating circumstances. Id. at 3. It also found a lack of prejudice in the failure to present statutory mitigating circumstances, specifically stating: "This Court finds that even if the Defendant had been successful in raising the two statutory mitigating circumstances that he now alleges, that a sentence of death would still have been the result." Id. at 4 (emphasis added). Those "two statutory mitigating circumstances" were that Johnson was unable to conform his conduct to the requirements of the law and that he was under extreme emotional disturbance. The state collateral court never addressed Johnson's abusive background, and whether there was a reasonable probability of a different result if the non-statutory evidence about it had been presented.

On appeal from the denial of state collateral relief, the Florida Supreme Court noted that the trial court's determination about the lack of prejudice considered only the statutory mitigating circumstances, see Johnson III, 593 So. 2d at 209 ("As to the mitigation issue, the trial court found that even had counsel been able to present evidence of two statutory mitigating circumstances, 'a sentence of death would still have been the result' because of the greater weight of

48

the five aggravating circumstances") (emphasis added), and that the trial court's ruling on non-statutory mitigating circumstances was on the deficiency prong, see id. ("In regard to nonstatutory mitigating circumstances, the trial court found no merit to the claim of deficient performance, noting that counsel presented evidence of six nonstatutory mitigating circumstances.").

The Florida Supreme Court affirmed the trial court's decision and held that Johnson's trial counsel's investigation and presentation of mitigating evidence was not deficient. It did not reach or rule on the prejudice prong. Id. The court stated:

> Johnson's first claim of ineffective assistance is based on trial counsel's alleged failure to adequately investigate and present mitigating evidence (claim 1). After reviewing the record from the trial and the 3.850 evidentiary hearing, the trial court concluded that counsel conducted a reasonable investigation into Johnson's background and had enough information available to "make informed strategic decisions as to the proper course of action to pursue in defending the [d]efendant." As to the mitigation issue, the trial court found that even had counsel been able to present evidence of two statutory mitigating circumstances, "a sentence of death would still have been the result" because of the greater weight of the five aggravating circumstances. In regard to nonstatutory mitigating circumstances, the trial court found no merit to the claim of deficient performance, noting that counsel presented evidence of six nonstatutory mitigating circumstances. After reviewing the record, we agree that counsel's investigation and presentation of mitigating evidence was not deficient under the standards set forth in Strickland.

Id.  As a result of the Florida Supreme Court's decision on the performance prong and non-decision on the prejudice prong, we review the holding that counsel's performance was not deficient with AEDPA deference, but we must conduct a plenary review of whether Johnson was prejudiced by his counsel's failure to present non-statutory mitigating circumstances.  Ferrell v. Hall, ___ F.3d ___, 2011 WL 1811132, at *19 (11th Cir. 2011) ("[Where] the state court has denied the petitioner's claim on only one prong of the Strickland test . . . we review de novo the prong that the state court never reached."); id. at *21 (holding that although the state court analyzed the prejudice prong in the Strickland analysis, because it "never reached the prejudice prong . . . we evaluate this element de novo");  see also Rompilla v. Beard, 545 U.S. 374, 390, 125 S.Ct. 2456, 2467 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice and so we examine this element of the Strickland claim de novo.") (alterations and citations omitted); Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 2542 (2003) ("[O]ur review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the Strickland analysis.").[9]

---

[9]The Supreme Court's recent decision in Harrington v. Richter, ___ U.S. ___, 131 S.Ct. 770, 784 (2011), where the state supreme court had issued a summary order denying relief, tells us that "[w]here a state court's decision is unaccompanied by an explanation, the habeas

A.

Johnson's claim of deficient performance includes his contention that Jones, his trial counsel, failed to investigate and present non-statutory mitigating evidence concerning his background. The Supreme Court has held that based on standards applicable in 1980—the year of Johnson's trial—an attorney representing a capital defendant has an "obligation to conduct a thorough investigation of the defendant's background." Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 1515 (2000); cf. Porter v. McCollum, ___ U.S. ___, 130 S.Ct. 447, 452 (2009) ("It is unquestioned that under the prevailing professional norms at the time of [defendant's 1988] trial, counsel had an obligation to conduct a thorough investigation of the defendant's background.") (quotation marks omitted); Ferrell, 2011 WL 1811132, at *3, *29 (finding that the state court unreasonably applied Strickland when it did not find ineffective assistance in connection with a 1988 trial where counsel, among other things, "failed to

petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." The Court's instruction from Harrington does not apply here because the Florida Supreme Court did provide an explanation of its decision which makes clear that it ruled on the deficiency prong but did not rule on the prejudice prong, and it is also clear that the trial court's ruling on the prejudice prong did not address counsel's investigation and presentation of non-statutory mitigating circumstances evidence. Johnson II, No. CR 80-101 at 3–4. As a result, we are still required to follow the Court's instructions from Rompilla and Wiggins and conduct de novo review. See Ferrell, 2011 WL 1811132, at *20–21.

51

investigate [the defendant's] upbringing . . . which would have uncovered evidence [that included his] impoverished and abused childhood").

However, "our principal concern . . . is not whether counsel should have presented [mitigation evidence]. Instead, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." Wiggins, 539 U.S. at 523, 123 S.Ct. at 2536 (emphasis omitted). The Supreme Court has also instructed that, "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690–91, 104 S.Ct. at 2066.

In Cullen v. Pinholster, ___ U.S. ___,131 S.Ct. 1388 (2011), the Supreme Court stated that the Ninth Circuit had "misapplied" Strickland when it "drew from [the Court's] cases a constitutional duty to investigate and the principle that it is prima facie ineffective assistance for counsel to abandon their investigation of the petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.'" Id. at ___, 131 S.Ct. at 1406 (quotation marks, alterations, and citations omitted). The Court explained that "the Strickland test of necessity requires a case-by-case examination of the evidence," id. at ___, 131 S.Ct. at 1407 n.17 (quotation marks omitted), and that "Strickland

52

itself rejected the notion that the same investigation will be required in every case," id. at ___, 131 S.Ct. at 1406–07.  As a result, in each case we must determine whether counsel conducted a reasonable background investigation "or" made a reasonable decision that made conducting a background investigation unnecessary.  Id. at ___, 131 S.Ct. at 1407 (quoting parenthetically Strickland, 466 U.S. at 691, 104 S.Ct. at 2066).

The question under Strickland is not whether Johnson's trial counsel's overall performance at the sentence stage was exemplary or even average, but whether he conducted an adequate background investigation or reasonably decided to end the background investigation when he did.  See Ferrell, 2011 WL 1811132, at *21 ("'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' but those made after 'less than complete investigation' are reasonable only to the extent that reasonable professional judgment supports the limitations on investigation.") (quoting Strickland, 466 U.S. at 690–691, 104 S.Ct. at 2066).  And as the recent Harrington decision emphasized, because our deficiency inquiry is governed by AEDPA, the question is not just if counsel's investigative decisions were reasonable, but whether fairminded jurists could disagree about whether the state court's denial of the ineffective assistance claim was inconsistent with Supreme

53

Court precedent or was based on an unreasonable determination of the facts. See Harrington, 131 S.Ct. at 785–86; 28 U.S.C. § 2254(d). If fairminded jurists could reasonably disagree, then habeas relief is due to be denied.

Given the overwhelming evidence of guilt, any reasonable attorney would have known, as Jones testified he actually did know, that the sentence stage was the only part of the trial in which Johnson had any reasonable chance of success. Even though the only stage at which he had any hope of saving his client from execution was the sentence stage, Jones waited until the eleventh hour to begin preparing for it and then, not surprisingly, failed to adequately do so. Although Jones started talking with Johnson from the outset of his representation, which began four months before the trial, there is no indication that he thoroughly questioned Johnson about his childhood and background. And Jones spoke with no one else about Johnson's background during those four months.

Sometime during his representation—whether it was at the outset or later we do not know—Johnson told Jones he had a bad childhood, including an alcoholic and abusive father who would abandon the family. Jones did nothing to pursue that information before the trial began. Only late on Friday after the trial was completed and had resulted in the expected conviction did Jones begin his investigation for the sentence hearing, which was to begin the following Monday

54

morning.  According to Jones' own testimony, his investigation into Johnson's family background consisted of talking with Johnson's father, and "that's about the extent of it."  When Johnson's father denied having been an abusive alcoholic, Jones accepted the father's denial without checking with any other family member, several of whom were ready, willing, and able to testify that Johnson was telling the truth about his abusive upbringing.  Jones did not discover those witnesses and their important testimony because he did not have time to look for them, and the reason he didn't have time is that he waited until it was too late to investigate his client's allegations of abuse.  Jones never even attempted to get a continuance of the trial so that he would have more time to investigate.  Only after the guilt stage was over on Friday night and the sentence hearing was scheduled to begin on Monday morning did Jones ask for a continuance so that he could investigate mitigating circumstances.  The trial judge understandably did not look with favor on that last minute request.

No reasonable attorney who has every expectation that his client will be convicted and will be facing a death sentence would wait until the guilt stage ended before beginning to investigate the existence of non-statutory mitigating circumstances.  No reasonable attorney, after being told by his client that he had an abusive upbringing, would fail to interview members of his client's family who

were readily available and could corroborate or refute the allegations of abuse. No reasonable attorney told by his client that he had an alcoholic and abusive father would fail to pursue those non-statutory mitigating circumstances simply because the father denied it. Had Jones talked with Johnson's older brother, or his sister, or his ex-wife, or his aunt, or his uncle, or as far as we can tell any family member other than the one who had abused him, Jones would have learned the extent of Johnson's traumatic background. A conversation with any one of those obvious, willing, and readily available witnesses is all it would have taken to discover that Johnson was telling the truth and that his father was not.

Jones could give no reason why he did not undertake such a simple step, and we cannot think of one, other than the obvious fact that he had waited too late to start investigating his client's background. He simply ran out of time, but given the overwhelming case proving that his client had committed the murders, it was unreasonable for him not to allocate even a few hours of time before the trial to investigating his client's claim of having been abused by an alcoholic father.

This is not a case in which counsel relied on what his client told him, or failed to tell him, about his background. See DeYoung v. Schofield, 609 F.3d 1260, 1287–88 (11th Cir. 2010); McClain v. Hall, 552 F.3d 1245, 1252 (11th Cir. 2008); Newland v. Hall, 527 F.3d 1162, 1202 (11th Cir. 2008); Stewart v. Sec'y,

56

Dep't of Corr., 476 F.3d 1193, 1211 (11th Cir. 2007). It is, instead, a case in which counsel failed to adequately investigate what his client did tell him.

In Williams v. Taylor, a habeas case governed by AEDPA, the Supreme Court held that trial counsel had performed deficiently because they failed to adequately investigate their client's background. 529 U.S. at 395–96, 120 S.Ct. at 1514–15. The Court explained that:

> [Although] counsel competently handled the guilt phase of the trial . . . [t]he record establishes that counsel did not begin to prepare for [the sentence] phase of the proceeding until a week before the trial. They failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation . . . . Had they done so, the jury would have learned that Williams' parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and then, after his parents were released from prison, had been returned to his parents' custody.

Id. at 395, 120 S.Ct. at 1514 (citation and footnote omitted). At least the attorneys in that case started a week before trial; in this case Jones did not even do that. The Supreme Court explained in Williams v. Taylor that "it is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with th[is] mitigating evidence that his trial counsel either failed to discover or failed to offer," and that his counsel's failure to do so "clearly demonstrate[s]

57

that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." Id. at 393, 396, 120 S.Ct. at 1513–15.

And in Ferrell, another habeas case governed by AEDPA, we held that counsel "conducted a profoundly incomplete investigation, and [his] judgment to so sharply limit [his] inquiry fell far outside the wide range of professional competence." See 2011 WL 1811132, at *22. The decision of the attorney in Ferrell to end the investigation was not reasonable even though his investigator had interviewed 40–45 witnesses about the defendant's character, because he "did not speak with any penalty-phase witnesses, or potential witnesses, aside from the parents, until immediately following the guilt-innocence phase, while the jury was out." Id. at *24, *26 (quotation marks omitted). Trial counsel explained that he had stopped investigating the defendant's background because interviews of those 40–45 witnesses did not yield much productive information about the defendant's character and, in any event, he planned on using a residual doubt defense at the sentence stage. Id. at *26.

This Court reasoned in Ferrell that if counsel had "adequately utilize[d]" the family members he had spoken with, or had asked the defendant's other family members and neighbors about his background, counsel would have discovered the defendant's father's "gambling problem," "how [his] father used to beat [him]"

58

and how he "bore the brunt of his father's considerable anger," that his family was "repeatedly evicted from their homes," and that his mother "had attempted suicide." Id. at *25–26. Because counsel failed to "elicit[] [that] significant, and powerful, additional mitigating evidence from the witnesses who were willing to testify . . . if counsel had only asked [them] about the defendant's background and childhood," we concluded that he had "fail[ed] to conduct any reasonable investigation into the defendant's background and upbringing . . . and fail[ed] to explain adequately why [he] unreasonably limited [his] mitigation investigation." Id. at *25–26.

And in Williams v. Allen, 542 F.3d 1326, 1340 (11th Cir. 2008), another habeas case governed by AEDPA, we held that trial counsel performed deficiently when they tried to obtain firsthand knowledge about the defendant's background only from the defendant's mother. We explained that "[b]y choosing to rely entirely on her account, trial counsel obtained an incomplete and misleading understanding of [the defendant's] life history." Id. We stated that "[a] reasonable investigation . . . should have included, at a minimum, interviewing other family members who could corroborate the evidence of abuse." Id. We concluded that "trial counsel abandoned their investigation at an unreasonable point, particularly

59

in light of the information about [the defendant's] background that the investigation revealed." Id. at 1341.

In light of those decisions, all of which applied the AEDPA deference provisions, Jones' failure to adequately investigate Johnson's background and his resulting failure to present the non-statutory mitigating circumstances evidence fell below the standards of reasonably competent legal performance guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. It was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066; see also Ferrell, 2011 WL 1811132, at *22.

One can conceive of circumstances in which an attorney's failure to uncover the non-statutory mitigation in his client's background, like those that were readily available in this case, might not amount to constitutionally deficient performance, but those circumstances are not present in this case. Jones' failure to investigate mitigating circumstances was not influenced by a strong possibility of getting his client acquitted of the capital murder charge; he realized that there was little or no chance of that. Jones' failure to investigate was not based on what his client said or failed to say; it was based on nothing more than a self-serving denial by the person who had been the alleged abuser. Jones' failure to investigate was not based on any strategic purpose such as avoiding the possibility of opening the

door to what could be harmful evidence; he was never concerned about that nor did he have any reason to be. Finally, his failure to investigate was not based on any difficulty in finding other family members or in getting them to talk with him; they were available and willing to talk, but he made no effort to find out what they would say.

The Florida Supreme Court, however, reached a different conclusion on this issue than we do. It stated that: "After reviewing the record, we agree that counsel's investigation and presentation of mitigating evidence was not deficient under the standards set forth in Strickland." Johnson III, 593 So. 2d at 209. Even after affording that decision the substantial deference it is due, we conclude that it is contrary to or an unreasonable application of the clearly established federal law set out in Strickland, as shown by the post-AEDPA decisions of the Supreme Court in Williams v. Taylor and in Wiggins. See Williams v. Taylor, 529 U.S. at 395–98, 120 S.Ct. at 1514–15 (basing an "obligation to conduct a thorough background investigation" on standards set forth in 1980); see also Wiggins, 539 U.S. at 522, 123 S.Ct. at 2535–36 (stating that Williams v. Taylor was squarely governed by Strickland and did not create new law); accord Williams v. Allen, 542 F.3d at 1342 (failing to conduct a reasonable background investigation for a trial in 1990 was deficient under AEDPA). In Harrington terms, fairminded jurists

could not disagree about whether the state court's denial of this claim was inconsistent with earlier Supreme Court decisions, including Strickland and Williams v. Taylor. Our decisions in Ferrell and Williams v. Allen, in which we found ineffective assistance of counsel despite AEDPA mandated deference, confirm that. More importantly, so does the Supreme Court's decision in Williams v. Taylor, another AEDPA deference case.

## B.

Because the state courts did not decide the prejudice issue, we decide it de novo. See Ferrell, 2011 WL 1811132, at *19, *21; see also Rompilla, 545 U.S. at 390, 125 S.Ct. at 2467; Wiggins, 539 U.S. at 534, 123 S.Ct. at 2542. The prejudice issue "is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695, 104 S.Ct. at 2068. This standard "do[es] not require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.'" Porter v. McCollum, ___ U.S. ___, 130 S.Ct. 447, 455–56 (2009) (quoting Strickland, 466 U.S. at 693–94, 104 S.Ct. at 2068). In making this determination "we evaluate the totality of the

evidence—both that adduced at trial, and the evidence adduced in the habeas proceedings." Wiggins, 509 U.S. at 536, 123 S.Ct. at 2543 (quotation marks, alteration, and emphasis omitted).

"The major requirement of the penalty phase of a trial is that the sentence be individualized by focusing on the particularized characteristics of the individual." Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir. 1987). For that reason, "[i]t is unreasonable to discount to irrelevance the evidence of [a defendant's] abusive childhood." Porter, ___ U.S. at ___, 130 S.Ct. at 455. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947 (1989) (quotation marks omitted), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304, 12 S.Ct. 2242 (2002); see also Porter, 130 S.Ct. at 454 (quoting parenthetically Penry for that proposition); Wiggins, 509 U.S. at 535, 123 S.Ct. at 2542 (same). The Supreme Court has instructed us that a troubled history that includes "severe privation," "abuse," "physical torment," and an "alcoholic, absentee mother," is the kind of troubled history that the Court has "declared

63

relevant to assessing a defendant's moral culpability."  Wiggins, 539 U.S. at 535, 123 S.Ct. at 2542.

The description, details, and depth of abuse in Johnson's background that were brought to light in the evidentiary hearing in the state collateral proceeding far exceeded what the jury was told.  The picture Jones painted for the jury was of Johnson having cold and uncaring parents, something in the nature of the "American Gothic" couple.  With a reasonable investigation, though, he could have painted for the jury the picture of a young man that was more closely resembled the tormented soul in "The Scream."  There is nothing wrong with a Grant Wood's approach, if that is all one has to use, but an Edvard Munch's approach would have been far more likely to sway the jury to sympathy for Johnson.

At the sentence hearing Jones did not even establish that Johnson's parents were alcoholics.  He did bring out the fact Johnson's father would take a drink, but the jury was told only that he would partake in "weekend drinking," and that his wife would also drink.  The evidence that Jones should have uncovered and presented to the jury was that both of Johnson's parents were abusive alcoholics. Johnson's father was always drinking, "no matter what day or whether it be

64

morning or night," and his mother was "rarely [seen] without a beer or drink in her hand."

Because of his constitutionally inadequate investigation, Jones also introduced other evidence at the sentence hearing that was not nearly as helpful to his client's case as it could have been. Under his questioning Arthur Johnson, the father, testified that Johnson was placed in an orphanage because he and his wife were separated, and that Johnson was sent to live with his grandparents because his father had moved to Florida for employment purposes. That was not true. If Jones had conducted a minimally adequate investigation, he would have known that the reason Johnson was placed in the orphanage was that his father had deserted his family to go on a three month "binge" in Detroit, and that the reason Johnson was later sent to live with his grandparents was because the father had abandoned his family again. See Ferrell, 2011 WL 1811132, at *35 (finding that the defense case was harmed by the introduction of evidence that misleadingly minimized the mitigating circumstances).

An adequate investigation would have led to the jury hearing about how Johnson and his siblings would hide in their bedroom "huddled together in terror" when their father would come home drunk and beat their mother, knowing that if they did not hide they would be beaten too. And the jury would have heard that

65

the violence extended both ways, with Johnson's mother getting into "knock-down, drag-out fights" with his father and even attacking him with a butcher knife. It would have also heard that the parents' fights regularly got so far out of control that Johnson's older brother would run over to their neighbors' house and call the police.

A minimally adequate investigation would have led to the jury hearing about the physical and emotional abuse Johnson's mother inflicted on him, about how she beat him more severely than the other children—sometimes with her knuckles and sometimes with a leather strap—and how she would "single him out" for emotional torment.

If Jones had conducted an adequate investigation into his client's background, the jury would not have been left with the impression that Johnson's grandparents were caring and nurturing people. Instead, the jury would have learned from Johnson's brother that their grandparents inflicted "horrible" physical and emotional abuse on them in a home he described as "pure hell." The jury also would have learned that Johnson's grandparents targeted and psychologically tormented him by, among other things, rubbing his face in his own urine when he wet the bed.

The jury heard nothing about Johnson witnessing his mother's repeated suicide attempts. It was not told about how on one occasion Johnson, after witnessing the usual fighting between his parents, which ended with his father hitting his mother to "shut her up," found his mother lying in bed after 3 a.m. with a plastic bag over her head. Or about a family Christmas, which included the usual drunken fighting between their parents, that ended with the police coming to their home because their mother again had attempted to commit suicide, this time by taking an overdose of tranquilizers. Or about when Johnson's mother tried to slit her wrists, yet another one of her suicide attempts.

Although the jurors did hear about how Johnson blamed himself for his younger brother's death in Vietnam and for his mother's death, they did not hear how his mother and brother died. They did not learn that his mother killed herself the same way his brother died—with a drug overdose. And the jury was not told that Johnson found his mother's body, with a photograph of his dead brother clutched in her hands. Nor was the jury told that when recalling the events surrounding their deaths, Johnson would feel so guilty and grief stricken that he would "fall apart."

The evidence about Johnson's childhood and family that the jury did not hear is similar to that which the jury did not hear in Williams v. Taylor, 529 U.S.

67

at 395, 120 S.Ct. at 1514. The murders in this case were no more brutal than the murder in that case. See id. at 367–368 & n.1, 120 S.Ct. at 1499–1500 & n.1. The defendant's criminal record and other aggravating circumstances were as bad in that case as in this one. See id. at 368–69, 395, 120 S.Ct. at 1500, 1514. And in that case the Supreme Court held that prejudice had been established. Id. at 398, 120 S.Ct. at 1516.

The prejudice holding in Williams v. Taylor controls our decision here. In addition to the similarities we have just discussed, there is one dissimilar factor that makes a prejudice finding even clearer here. In that case AEDPA deference applied to the prejudice determination, Williams v. Taylor, 529 U.S. at 397–99, 120 S.Ct. at 1515–16, while in this case it does not. Because prejudice was found in Williams v. Taylor even after giving substantial deference to the state court's contrary decision, a prejudice finding is even more justified in this case where there is no contrary state court decision on prejudice to which deference is owed.[10]

---

[10]Actually, there is another dissimilarity between this case and Williams v. Taylor that leads us to believe that a finding of prejudice is even more strongly supported in this case than in that one. In that case the prejudicial effect of presenting additional mitigating evidence would have been offset to some extent by the harmful effect of some of the evidence itself. See Williams v. Taylor, 529 U.S. at 396, 120 S.Ct. at 1514 (finding prejudice even though "not all of the additional evidence [about the defendant's childhood] was favorable"). In this case, by contrast, the State has been unable to point to any of the additional evidence that was harmful to Johnson or that would have opened the door to admission of any harmful evidence. Cf. DeYoung v. Schofield, 609 F.3d 1260, 1291 (11th Cir. 2010) (discounting the possibility of prejudice because the new mitigating circumstances evidence "would have opened the door to

68

The district court erred in denying habeas relief on the ineffective assistance of counsel claim.[11]

**REVERSED AND REMANDED.**

---

harmful testimony which may well have eliminated any mitigating weight in the overall equation").

[11]Because Johnson is entitled to relief from the death sentence on his ineffective assistance of counsel claim, we need not decide his expert assistance claim.